BROWN-FORMAN DISTILLERS CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 43556, 49947.   Filed October 22, 1959.

*J. Marvin Haynes, Esq., N. Barr Miller, Esq.*, and *Oscar L. Tyree, Esq.*, for the petitioner.

*Donald W. Geerhart, Esq.*, for the respondent.

FORRESTER, *Judge:* Respondent has disallowed petitioner's claims for relief under section 722(b)(5) of the Internal Revenue Code of 1939,[1] with respect to excess profits taxes for its fiscal years 1942 to 1946, inclusive. As a result thereof, and of other relatively minor adjustments, the following deficiencies have been determined:

| Fiscal year | Income tax | Excess profits tax |
|---|---|---|
| 1942 | (¹) | $135,648.95 |
| 1943 | (¹) | 490,964.93 |
| 1944 | $1,303.36 | 992,200.02 |
| 1945 | 3,573.92 | 818,821.61 |
| 1946 | 3,860.12 | 299,435.32 |

¹ None.

[1] SEC. 722.   GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\*      \*      \*      \*      \*      \*      \*

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

Certain overassessments in income tax determined for the fiscal years 1941 and 1942 raise no separate issue.

### FINDINGS OF FACT.

The stipulated facts are so found.

Petitioner is a Delaware corporation organized October 19, 1933, with principal place of business in Louisville, Kentucky. On August 19, 1940, its name was changed from Brown-Forman Distillery Company to that which it now bears.

Petitioner is an accrual basis taxpayer, with a fiscal year ending April 30. The fiscal 1942 consolidated income tax and excess profits tax returns were filed for petitioner and five subsidiaries with the then collector of internal revenue for the district of Kentucky. Petitioner filed separate returns for fiscal 1943 to 1946, inclusive, with the same collector.

Petitioner's business consists of the manufacture, purchase, storage, warehousing, bottling, and distribution of distilled spirits. Petitioner is a successor to the business of Brown-Forman Distillery Company, a Kentucky corporation, which, prior to the 18th amendment to the Constitution of the United States, had, with its predecessor, engaged in that business since 1870. While the 18th amendment was in effect, it manufactured and sold a bourbon whisky under the trade name Old Forester for medicinal purposes under one of eight permits issued under the Medicinal Spirits Act.

The 18th amendment was repealed December 5, 1933. By the latter part of 1933 repeal had become reasonably certain, and petitioner sought a means of developing its business. On advice of investment bankers, the old Kentucky corporation was reorganized into the present petitioner in October of 1933. Owsley Brown and his family received a majority of petitioner's stock, but about 45 per cent was issued to the investment bankers as underwriters, and sold to the public. The proceeds of sale were used by petitioner to expand its plant.

Petitioner acquired distilling, storage, and bottling capacity from its predecessor, and added thereto during the base period. The capacity of petitioner and its subsidiaries from the time petitioner commenced business just prior to the beginning of fiscal year 1935 to the end of its base period (April 30, 1940) was as follows:

*Distilling Capacity*

| | |
|---|---|
| At commencement of business | 57,000 bbls. per year |
| By Apr. 30, 1937 | 86,000 bbls. per year |
| By Apr. 30, 1940 | 126,000 bbls. per year |

*Storage Capacity*

| | |
|---|---|
| At commencement of business | 54,053 bbls. |
| By Apr. 30, 1936 | 103,697 bbls. |
| By June 1937 | 158,165 bbls. |

By Mar. 1940—(This addition to capacity of 11,286 bbls. due to
  acquisition of Old Kentucky Distillery) _____ 169,451 bbls.

*Bottling Capacity*

At commencement of business _____ 200,000 cases per year
By Mar. 1934 _____ 900,000 cases per year
By end of base period _____ 1,450,000 cases per year

Following the repeal of prohibition and for the greater part of the base period, the distillery industry was chaotic. The only legal whisky in existence at repeal consisted of the remains of preprohibition stock and the relatively small amounts distilled under the Medicinal Spirits Act. Moreover, most distilleries had been dismantled, or were greatly deteriorated. A frantic construction program ensued, continuing into 1936.

Those companies which had held permits under the Medicinal Spirits Act promptly entered postrepeal production, with others following as soon as they could. Three-month-old whiskies were first put on the market, with increases in age of 3 and then 6 months' intervals, until an adequate supply of 4-year-old whisky came into existence. Many brands were sold at each intermediate age, and the distillers, at each increase, had to make adjustments on younger stock still held by wholesalers.

Since repeal, and particularly during the years 1934 to 1940, inclusive, the industry has consisted of the four following classes of distillers:

1. Four companies known in the industry as the "Big Four." They sell bonded, straight, and blended whiskies, the three major categories of domestic distilled spirits, and also import and sell Canadian and Scotch whisky, cognac, wines, and other spirits. Their profits are derived from a large volume of sales of a fully diversified line of products.

2. Smaller companies selling on a national scale premium straight whisky, usually bonded, plus other straight whiskies necessary to provide a sufficiently diversified line to attract jobbers. The companies in this class, to which petitioner belongs, are known as "Independents." They cannot compete with the "Big Four" in volume, and depend upon quality products sold at a premium price.

3. Companies selling only on a local scale, usually comprising an area of 12 to 15 States.

4. Companies selling in bulk, i.e., to jobbers or other such bulk purchasers, in many cases along with the right to use a trade name.

Good quality bourbon whisky is made from the finest ingredients under controlled production, and must be aged in new white charred oak barrels at least 4 years before it is bottled and sold. Bottled-in-

bond whisky must be at least 4 years old, bottled 100 proof (50 per cent alcohol by volume) under Government supervision, and the names of the distiller and bottler disclosed. Straight whisky bottled out of bond is not subject to the above requirements, and is usually bottled 86 proof, i.e., 43 per cent alcohol by volume. Nonetheless, it may be of excellent quality if of good distillation and at least 4 years old. During the base period, the price of most straight whiskies was lower than that of bottled-in-bond whisky, and the gross profit thereon was considerably less.

The premium bonded bourbon whiskies now and during the base period consist of six top quality straight whiskies commanding a premium price. Most were produced and sold during prohibition under the Medicinal Spirits Act. They are as follows:

| Brand | Distiller |
|---|---|
| Old Grand Dad | National Distillers Products Corporation. |
| Old Taylor | National Distillers Products Corporation. |
| Old Forester | Brown-Forman Distillers Corporation. |
| I. W. Harper | Schenley Distillers Corporation. |
| Kentucky Tavern | Glenmore Distilleries Company. |
| Old Fitzgerald | Stitzel-Weller. |

The last two brands have generally been priced somewhat lower than the preceding four, although of comparable quality. Petitioner's traditional Old Forester label bears the words, "This whisky is distilled by us only * * *." The use of this label requires exclusive utilization of petitioner's own distillation. Federal law additionally requires a strip stamp over the neck of the bottle of a bottled-in-bond whisky, identifying the distiller. Petitioner's sole use of outside distillation in Old Forester consisted of 201 barrels of Old McBrayer in 1937 or 1938, which it marketed in a limited area. The public repudiated this product and petitioner had to take back most of it from its jobbers. This episode injured petitioner's reputation in that area.

When petitioner was first organized, its controlling stockholders had hopes that eventually its products could be sold approximately one-half as Old Forester and one-half as quality straight whiskies not bottled in bond. The profit on Old Forester was much higher than that on nonbonded whisky even in relation to selling price or proof, and it was to petitioner's interest to sell as much as possible of its own distillation as Old Forester. Sale of as much as one-half of its product as Old Forester was a hoped-for ideal—in essence a wish that public demand would eventually permit such a ratio. There was no intention to actually limit sales of Old Forester to that ratio if events should unexpectedly prove so fortunate that even a larger proportion of petitioner's own distillation could be so sold. When an abnormal demand during certain of the World War II years permitted, petitioner sold virtually all of its own distillation as Old Forester.

Petitioner's storage, bottling, and distilling capacity was sufficient at least as early as April of 1934 to permit the manufacture of 57,000 barrels of whisky per year, of which about 30,000 to 35,000 barrels could have, given the necessary financing, been retained and aged for 4 to 4½ years without leasing outside storage facilities. Although petitioner, from its inception, had hoped to save and age as much of its own distillation as possible, it did not do so immediately, either because of inadequate working capital or because of the lure of more immediate profits from sales of young bulk and bottled whiskies.

During the first 18 months or so of its existence petitioner sold substantial quantities of bulk whisky. In fiscal 1935 a profit in the amount of $444,717.11 was realized in this manner. This practice did not continue beyond the middle of 1935, and petitioner in later years, as hereinafter set forth, repurchased much of this whisky at substantially higher prices.

The sale of young, cheap, bottled whisky proved quite profitable in fiscal 1936 and 1937. In those years petitioner realized the following net income, principally from the sale of such whiskies: [2]

| Fiscal year | Net income |
|---|---|
| 1936 | $905,612 |
| 1937 | 763,033 |

Shortly after repeal, petitioner inadvertently sold some "green" whisky, resulting in claims settled only upon payment of substantial damages. During this period, Owsley Brown, the principal stockholder, was preoccupied with industrywide affairs rather than petitioner's own business. The firm which had underwritten and sold petitioner's stock demanded a full-time executive, and their nominee, Clarence Doiseau, became petitioner's executive vice president and chief executive officer in the fall of 1934.

Doiseau envisioned full-scale competition with the "Big Four" and caused petitioner to market many brands of cheaper whiskies. This proved profitable until the earlier shortage of cheaper whiskies abated during 1937, heralding keen competition and price reductions. By June of 1937, industry stocks of all ages had become 445,285,663 gallons, although the supply of whisky at least 4 years of age was still negligible. The price reductions following the increased supply of younger whiskies drastically lowered petitioner's profit margin. Its inability to compete "across the board" with the "Big Four" then became apparent.

During the early part of the base period, almost all of petitioner's production had been sold as young bottled whiskies or in bulk, and no substantial quantity had been saved for aging and sale as Old Forester and other quality whiskies. As a result there was in 1937 considerable concern over and discussion of future plans.

[2] Petitioner's fiscal 1934 net income of $506,263 was probably mainly from sales of young whiskies, but petitioner's 1934 records contain no breakdown showing types of sales.

Earlier, on December 5, 1935, there had been a meeting between representatives of petitioner, its commercial banks, and its investment bankers. The memorandum thereof, which the parties treated as an agreement, reads in part as follows:

As a result of an all day discussion, the following conclusions were reached:

1. The Citizens Union National Bank is holding 20,000 barrels of 1935 production on their $300,000.00 loan and has declined to carry the loan on any other basis. It was decided to permit this loan to remain in a preferential position rather than possibly injure the company by having a severance of this connection generally known.

2. The collateral security on other bank loans is to be redistributed in an equitable proportion as to amount and ages, and accepted by the banks on the following loan valuation basis at the present time:

| | |
|---|---|
| 1935 production | $20.00 per barrel |
| Fall of 1934 production | 45.00 per barrel |
| Spring of 1934 | 55.00 per barrel |
| Prior production | 60.00 per barrel |

3. It is estimated that the barrel goods inventory of the company at the present time approximates 56,653 barrels. Deducting the 20,000 barrels held by the Citizens Union National Bank, it is estimated that the remainder on the loan basis mentioned above will support bank borrowing of $1,265,000.00. These borrowings are to be distributed in the following manner:

| | |
|---|---|
| First National Bank of Chicago | $245,000.00 |
| First National Bank of St. Louis | 245,000.00 |
| Commercial National Bank & Trust Company of New York | 500,000.00 |
| First National Bank of Louisville | 275,000.00 |

A total assured credit of $1,815,000.00 was therefore made available to the company by the commitments mentioned above, plus the $300,000.00 now held by the Citizens Union National Bank, and the $250,000.00 State Store credit available at the Commercial National Bank & Trust Company of New York. The company has approximately $95,000.00 in bulk sale contracts and other notes receivable which the First National Bank of Chicago and the First National of St. Louis have agreed to discount if an examination of the paper discloses the risk to be satisfactory.

4. It is the desire of the company and the banks to, at the earliest possible moment, reduce the borrowings to at least $15.00 per barrel on the company's total barrel inventory, regardless of age. It is estimated that this point can be reached early in 1937. As a means of approaching this end without ruinous curtailment of sales and subsequent withdrawal of whisky pledged to banks, it was agreed that for the time being current production would be accepted at $20.00 per barrel in exchange for pledged whisky.

5. Warehouse receipts for out of town banks interested in this credit are to be held by the Kentucky Title Trust Company in safekeeping for the account of each individual bank, the company to stand the expense in connection therewith. The Kentucky Title Trust Company is to be authorized to allow substitution in the collateral by the company on the basis of the values herein mentioned, without requiring further authority from the banks.

6. The company is to furnish adequate insurance protection on the warehouse receipts pledged to the various banks and is to handle its substitution of receipts as to not materially alter the prorate distribution of collateral herein provided,

7. The company is to confine its program strictly within the limits of the credit herein mentioned until such time as other plans are agreed on between the company and its banks.

8. No further dividends are to be declared by the company without the consent of the banks.

9. By appropriate resolution of the Board of Directors of the Brown-Forman Distillery Company, a representative of the banks is to be invited to attend all Board meetings of the company. By appropriate resolution, also, the company is to furnish the banks with permission to remove bulk whiskey from the company warehouses, should the banks so desire, in any case, in which warehouse receipts representing such whiskey, shall have been reduced to possession by the banks.

10. It is understood and agreed that the company's further investment in fixed assets will be confined to the completion of the warehouse now under way, and an investment of not over $50,000.00 for an enlargement of production facilities.

11. The company is to adopt and begin using, as soon as possible, the standard form of warehouse receipts developed by the Bankers' Committee earlier in the year.

12. The company is to furnish the banks with monthly balance sheets and operating results in such detail as the banks may suggest.

13. It was generally understood that overhead expense would receive the closest scrutiny by the officers of the company and that definite steps were under way not to curtail expense of distribution as related to the New England, New Jersey, Delaware, Maryland, Colorado, Utah and Wyoming territories, as well as the elimination of the New York office and its incident expense.

14. Mr. Owsley Brown gave his personal assurance to the interested banks that the program outlined would not be deviated from, except by proper consultation with his banks.

15. The foregoing has been agreed on as a procedure to be followed by the company and its banks until about April 20th, 1936, at which time a general review of the program is to be had.

Under a supplemental memorandum dated July 21, 1936, petitioner was allowed a credit line of $2 million by its commercial bankers, as follows:

(1) Each Bank signatory hereto shall extend to the Company the credit lines below set opposite its name, upon the terms and conditions hereinafter set forth:—

| Name of Bank | For First 24 Months | For First 3 Months Thereafter Ensuing | For Second 3 Months Thereafter Ensuing | For Third 3 Months Thereafter Ensuing | For Fourth and Last 3 Months Thereafter Ensuing |
|---|---|---|---|---|---|
| The Commercial National Bank & Trust Company of New York | $600,000 | $525,000 | $450,000 | $375,000 | $300,000 |
| First National Bank of Louisville | 275,000 | 240,625 | 206,250 | 171,875 | 137,500 |
| First National Bank of Chicago | 575,000 | 503,125 | 431,250 | 359,375 | 287,500 |
| First National Bank in St. Louis | 550,000 | 481,250 | 412,500 | 343,750 | 275,000 |
| | $2,000,000 | $1,750,000 | $1,500,000 | $1,250,000 | $1,000,000 (which will be due three years after the beginning of the credit lines hereunder) |

Conditions attached to the foregoing line of credit included the following:

The credit lines herein provided for shall commence upon the consummation by the Company of the sale of 80,000 additional shares of its common stock, and the receipt by the Company for said stock of the sum of $400,000 in cash. * * *
    *      *      *      *      *      *      *

(5) In furtherance and in interpretation of Paragraph 7 of aforesaid Memorandum Agreement, the Company agrees that it will not, nor shall any of its subsidiaries, during the life of this credit:

(a) allow its consolidated net quick assets to fall below $1,600,000 without consent. * * *

(b) permit its consolidated current liabilities (including construction contracts other than construction contracts appertaining to bonded warehouse now in contemplation) to exceed $900,000, exclusive of:

(1) undelinquent income taxes;

(2) contractual liabilities for supplies, raw materials and other articles and merchandise undelivered;

(3) contingent liabilities;

(4) advances under the credit herein provided for;

(5) a principal obligation of $125,000 payable in 1940, represented by the Company's note to Owsley Brown. (This obligation shall be so excluded only as long as the interest thereon shall be paid and the company does not anticipate the maturity of said obligation or permit such maturity to be precipitated.)

(c) acquire any new subsidiary at a cost of over $10,000 without consent.

(d) without consent:

(1) pledge or mortgage any assets;

(2) borrow any money (except as herein provided for);

(3) execute any time obligations except within the limits of consolidated current liabilities specified in this paragraph;

(4) sell any accounts receivable with recourse;

(5) incur any direct or contingent debts except those incident to operation;

(6) undertake any transaction involving lending money or credit, the aggregate amount of which outstanding at any one time shall be in excess of $10,000, but nothing herein contained shall in any way be deemed to limit the granting of usual credit for merchandise sold to customers.

Borrowings were to be evidenced by notes maturing not later than 15 months from date, with interest at not less than 4 per cent nor more than 6 per cent per annum. Petitioner also undertook to pay the banks a commission of 1 per cent per annum on the amount of loans outstanding under the credit line. Applications for loans were made pursuant to the line of credit so granted, and $2 million was loaned to petitioner by the participating banks.

The net results for the first half of the fiscal year ending April 30, 1938, were disappointing. Loans were due to mature beginning in September of 1938, and the commercial bankers had a conference. Petitioner's affairs were discussed, and the bankers did not agree with Doiseau's system of operations. To create cash with which to meet obligations as they matured, the bankers required petitioner to cease

distilling operations, thus conserving $5,000 or $6,000 cash per working day. In 1938, petitioner distilled no whisky from January 1 until late in October.

By supplemental agreement dated September 1, 1938, petitioner agreed to repay its indebtedness to the banks on or before September 1, 1939. To assure payment, petitioner agreed to deposit 50 cents for each case of whisky sold during a specified period with the Kentucky Title Trust Company as trustee for application on the indebtedness. The agreement of July 21, 1936, was to remain in force except as specifically modified. Subsequently, the date of payment of the balance due on indebtedness extended pursuant to the foregoing line of credit was further extended to September 1, 1940, the interest rate was fixed at 4 per cent per annum, and the loans were secured by a pledge of certain warehouse receipts.

Early in 1938, the other officers of petitioner concluded that Doiseau would have to be relieved of his responsibilities. They, like the bankers, disagreed with his policy of full-scale competition with the "Big Four." They also felt strongly that petitioner should save much more of its inventory for eventual sale as 4-year-old whisky. A plan of operations was conceived, essentially concerned with financing, and with expense and price controls. In an effort to meet competition and acquire business petitioner had reduced prices on Old Forester, and stabilization of its price structure was one of the big problems then facing it. This appraisal was known as the Sanderlin Plan.

The banks suggested that petitioner's management committee formulate the plan on the most conservative basis possible and submit it in writing. Work began immediately on a budget and a profit and loss projection, and was completed in February or March 1939.

The sales of Old Forester in relation to total sales were predicted as 18.33 per cent in 1939, 40 per cent in 1940, 37½ per cent in 1941, 45 per cent in 1942, and 50 per cent in 1943. This goal required and the plan anticipated retention of all current production for aging of 4 years or more. This retention plus the shutdown in 1938 in turn required additional purchases of outside distillations for straight whiskies, as well as a rationing of inventory produced prior to the shutdown. The projection indicated that petitioner could operate profitably, but would have to purchase 25,000 or 30,000 barrels of outside distillation.

It was also predicted that petitioner would sell 94,167 cases of 4-year-old bottled-in-bond whisky during its fiscal year ending April 30, 1940, and that the price of Old Forester per case of pints, exclusive of tax, would decline from the then current price of $24.85 to $18.60 by September 1939. Both assumptions proved erroneous. Only 40,016

cases of bonded whisky were sold in fiscal 1940, and there were no further price declines on Old Forester.

Pending formulation of the plan the bankers agreed to an extension of about 9 months on loans due. The plan was submitted in March or April of 1939 and the bankers concurred. As a result, a renewal agreement was executed in April 1939 extending petitioner's loans approximately 18 months and permitting it to borrow sufficient sums to finance the necessary purchases of bulk whisky. Commencing in October 1938, when petitioner was permitted to resume distilling operations, its entire production, with the exception of 36 barrels, was aged to 4 years or more and sold after the base period.

During the early years of its existence, petitioner sold in bulk some of its own distillation. These sales were necessary at the time in order to finance petitioner's operations, and were to a degree responsible for the net profit realized by petitioner in its fiscal year 1936. Thereafter, and during the base period, petitioner repurchased as much of this whisky as it could locate to use in Old Forester. In pursuance of the Sanderlin Plan it purchased substantial quantities of other bulk whiskies as well.

The following is a summary of annual purchases of bulk whisky by petitioner in each of its fiscal years ended April 30, 1936, to April 30, 1943, inclusive:

| Year ended April 30— | Repurchases of Brown-Forman distillation | | Purchases of outside distillations | |
|---|---|---|---|---|
| | Number of bbls. | Cost | Number of bbls. | Cost |
| 1936 | 9,685 | $612,301.36 | 3,374 | $322,672.20 |
| 1937 | 2,201 | 146,142.60 | 2,490 | 157,819.76 |
| 1938 | 436 | 60,118.22 | 958 | 174,753.30 |
| 1939 | 2,951 | 276,335.35 | 5,790 | 184,336.15 |
| 1940 | 1,225 | 84,578.67 | 28,084 | 801,825.06 |
| 1941 | (1) | | 27,585 | 853,047.05 |
| 1942 | (1) | | 21,384 | 1,091,343.39 |
| 1943 | (2) | | 29,017 | 1,714,053.02 |

[1] 1 bbl. fall 1934 B–F distillation repurchased.
[2] 5 bbls. spring 1935 B–F distillations repurchased.

Purchases of Brown-Forman distillation by petitioner were at prices substantially exceeding petitioner's costs of distilling and carrying in inventory whisky of like ages.

In January of 1939, in order to further entrench itself in the quality whisky field, petitioner increased the age of some of its brands.

During petitioner's fiscal years 1937 to 1940, inclusive, its total case sales, case sales of bonded and of other whiskies in absolute quantity and in proportion of the total sold, gross profit per case on each type of sale, and total net income were as follows:

| Fiscal year ended April 30— | Total number of cases sold | Bonded whisky | | | Other whiskies | | | Total net income |
|---|---|---|---|---|---|---|---|---|
| | | Cases sold | Per cent of total | Gross profit per case | Cases sold | Per cent of total | Gross profit per case | |
| 1937 | 647,906 | 18,636 | 2.88 | $26.32 | 629,270 | 97.12 | $3.71 | $763,033 |
| 1938 | 491,577 | 36,449 | 7.41 | 14.57 | 455,128 | 92.59 | 3.27 | 3,005 |
| 1939 | 467,716 | 47,527 | 10.16 | 10.79 | 420,189 | 89.84 | 2.38 | 88,454 |
| 1940 | 470,297 | 40,016 | 8.51 | 11.11 | 430,281 | 91.49 | 2.66 | 230,417 |

In late 1939 and during 1940, petitioner purchased advertising space in trade papers and magazines of wide general circulation seeking to encourage liquor dealers to increase their stocks of Old Forester.

National Distillers, one of the "Big Four" of the industry, produces 2 of the 6 aforementioned bottled-in-bond bourbon whiskies, namely, Old Grand Dad and Old Taylor. National's expenditures in advertising Old Grand Dad and Old Taylor during the calendar years 1936 to 1939, inclusive, were as follows:

| Calendar year | Old Taylor | Old Grand Dad | Total |
|---|---|---|---|
| 1936 | $71,122 | $86,732 | $157,854 |
| 1937 | 85,150 | 96,565 | 181,715 |
| 1938 | 417,076 | 411,047 | 828,123 |
| 1939 | 411,018 | 501,544 | 912,562 |

The comparatively small expenditures in 1936 and 1937 were due to the relatively small inventory of 4-year-old whisky then available.

Petitioner incurred the following costs in advertising during the calendar years 1936 to 1940, inclusive:

| Calendar year | Total advertising | Straight whiskies, etc. | Old Forester | Old Forester per cent to total |
|---|---|---|---|---|
| 1936 | $665,091 | $663,815 | $1,276 | 0.2 |
| 1937 | 549,430 | 546,147 | 3,283 | 0.6 |
| 1938 | 304,409 | 272,807 | 31,602 | 10.4 |
| 1939 | 266,937 | 167,166 | 99,771 | 37.4 |
| 1940 | 286,053 | 132,025 | 154,028 | 53.8 |

Advertising a brand of whisky is long term and cumulative. Steady advertising is important in building consumer demand. The expense necessary to produce a desired number of sales of a given brand in any year is substantially affected by amounts spent in advertising the same brand in prior years.

During the early part of the base period the short supply of 4-year-old bourbon whisky created in essence a "seller's market." However, National always looked upon Old Forester as the biggest ultimate competitor of its own premium bourbon whiskies. Case sales

of Old Forester as compared to sales of Old Grand Dad and Old Taylor for 1937 to 1939, inclusive, were as follows:

| Year ending Apr. 30— | Old Forester | Old Grand Dad | Old Taylor |
|---|---|---|---|
| 1937 | 18, 636 | 46, 529 | 29, 579 |
| 1938 | 36, 449 | 348, 958 | 322, 473 |
| 1939 | 47, 527 | 292, 172 | 341, 225 |

Petitioner and National are not comparable. National is many times larger than petitioner, and markets a full line of distilled products. It entered the postprohibition era with much larger stocks of aged whisky in reserve and much larger distilling and storage capacity than petitioner and an established nationwide distribution and selling organization. Petitioner, in contrast, had limited capital, and very little aged whisky in reserve.

The selling, general, and administrative expenses (expressed as a percentage of net sales) of petitioner, National, and of distilleries registered with the Securities & Exchange Commission and for the years 1937, 1938, and 1939, were as follows:

|  | 1937 | 1938 | 1939 |
|---|---|---|---|
|  |  | Per cent |  |
| Petitioner | 20.5 | 26.5 | 20.1 |
| National | 18.0 | 17.6 | 18.3 |
| All distilleries registered with the SEC | 14.2 | 15.1 | 15.9 |

The net [3] whisky inventories for the entire industry of whiskies aged 3 to 4 years and over 4 years in bonded warehouses as of June 30 of each year, 1936 to 1940, inclusive, and total industry tax gallon withdrawals of bottled-in-bond whisky for years ending June 30, 1937 to 1940, inclusive, all in gallons, were as follows:

| Year | Inventories 3 to 4 years old | Percentage of total inventories | Inventories over 4 years old | Percentage of total inventories | Withdrawals |
|---|---|---|---|---|---|
| 1936 | 1, 850, 000 | 0. 7 | 1, 600, 000 | 0. 6 | (1) |
| 1937 | 11, 050, 000 | 2. 8 | 1, 325, 000 | 0. 3 | 1, 661, 888 |
| 1938 | 28, 025, 000 | 6. 9 | 6, 475, 000 | 1. 6 | 3, 686, 178 |
| 1939 | 78, 775, 000 | 19. 5 | 18, 500, 000 | 4. 6 | 6, 316, 668 |
| 1940 | 114, 975, 000 | 28. 7 | 53, 775, 000 | 13. 4 | 13, 569, 728 |

[1] Not shown.

Some unspecified portions of whiskies 3 to 4 years old were eventually bottled and sold other than in bond. Total gallons withdrawn each month and bottled in bond during the calendar years 1937 to 1939, inclusive, were as follows:

[3] After evaporation and leakage losses.

### 1937

| Month | Total with-drawn | Bottled-in-bond | Per cent of total |
|---|---|---|---|
| January | 4,527,656 | 124,008 | 2.74 |
| February | 5,775,331 | 94,671 | 1.64 |
| March | 5,829,234 | 94,771 | 1.63 |
| April | 5,449,404 | 144,704 | 2.66 |
| May | 5,132,539 | 132,508 | 2.58 |
| June | 4,491,935 | 100,450 | 2.24 |
| July | 4,125,786 | 72,709 | 1.76 |
| August | 4,657,691 | 156,635 | 3.36 |
| September | 6,342,612 | 94,213 | 1.49 |
| October | 8,104,153 | 171,128 | 2.11 |
| November | 9,106,745 | 382,719 | 4.20 |
| December | 6,789,772 | 381,565 | 5.62 |

### 1938

| Month | Total with-drawn | Bottled-in-bond | Per cent of total |
|---|---|---|---|
| January | 4,231,269 | 291,687 | 6.89 |
| February | 4,381,836 | 410,594 | 9.37 |
| March | 5,647,553 | 325,787 | 5.77 |
| April | 4,938,562 | 333,580 | 6.75 |
| May | 5,110,985 | 581,523 | 11.38 |
| June | 5,174,686 | 484,038 | 9.35 |
| July | 4,338,548 | 211,999 | 4.89 |
| August | 4,225,072 | 259,056 | 6.13 |
| September | 5,845,000 | 454,367 | 7.77 |
| October | 8,153,464 | 515,319 | 6.32 |
| November | 9,558,697 | 853,832 | 8.93 |
| December | 7,665,118 | 959,190 | 12,51 |

### 1939

| Month | Total with-drawn | Bottled-in-bond | Per cent of total |
|---|---|---|---|
| January | 5,007,399 | 370,690 | 7.40 |
| February | 4,995,994 | 354,401 | 7.09 |
| March | 6,790,806 | 604,166 | 8.90 |
| April | 5,728,328 | 563,161 | 9.83 |
| May | 4,865,880 | 548,189 | 11.27 |
| June | 4,884,717 | 622,298 | 12.74 |
| July | 4,334,371 | 538,488 | 12.42 |
| August | 5,065,658 | 658,723 | 13.00 |
| September | 6,786,763 | 930,033 | 13.70 |
| October | 8,533,535 | 1,175,933 | 13.78 |
| November | 10,369,954 | 1,685,579 | 16.25 |
| December | 7,682,693 | 1,791,532 | 23.32 |

By 1940, monthly industry withdrawals for bottled-in-bond had reached a level of approximately 1 million gallons. During 1940, 1941, and 1942, the annual demand for bottled-in-bond whiskies of all types and qualities was approximately 13,000,000 gallons.

In its fiscal year ending April 30, 1940, the average selling prices per case [4] realized by petitioner on bonded and other whiskies were, respectively, $16.97 and $5.97. Average gross profits per case on each class of business were, respectively, $11.11 and $2.66.

During each month from January 1939 to April 1940, inclusive, petitioner made the following use or sales (in cases) of its own distillation at least 4 years old:

[4] Excluding Federal withdrawal tax.

| Date sold or used 1939 | For B-F bonds [1] | Other than for B-F bonds | Date sold or used 1939—Con. | For B-F bonds [1] | Other than for B-F bonds |
|---|---|---|---|---|---|
| Jan | 4,010 | –0– | Oct | 4,032 | 2,483 |
| Feb | 1,959 | 104 | Nov | 6,144 | 3,263 |
| Mar | 5,895 | 2,249 | Dec | 4,689 | 1,547 |
| Apr | 4,896 | 2,600 | *1940* | | |
| May | 1,134 | 2,028 | | | |
| June | 1,636 | 2,080 | Jan | 3,721 | 2,821 |
| July | 1,348 | 2,340 | Feb | 3,187 | 3,497 |
| Aug | 1,191 | 1,105 | Mar | 4,693 | 2,340 |
| Sept | 2,294 | 1,391 | Apr | 5,947 | 3,497 |

[1] May 1, 1939, to April 30, 1940, sales of bonds, in addition to Old Forester include sales of Early Times, Apple Brandy, Old Forman, Old Polk, and for private stock in the amount of 4,524 cases. Petitioner introduced two medium-price bonded whiskies in fiscal 1940.

In addition, petitioner produced during its fiscal year ending April 30, 1940, approximately 200,000 cases of whisky out of bond from its own distillation between 3 and 4 years of age. The Brown-Forman distillation, 4 years or older, was suitable for use in Old Forester, and that 3 to 4 years of age would soon have become so.

Prior to 1939 no Brown-Forman distillation 4 years old or older had been used other than in bonded whisky, with the exception of 52 cases each in October and December of 1938. During its fiscal year ending April 30, 1940, petitioner bottled out of bond 1,339 barrels of its own distillation of 1935. Its inventory of earlier distillation was nominal. It also bottled out of bond during that fiscal year 5,481 barrels of distillation of the spring of 1936, and bottled in bond 748 barrels of that distillation.

Petitioner's closing inventory of its own distillation (in cases) at least 4 years old for each month from January 1939 to April 1940, was as follows:

| 1939 | | | |
|---|---|---|---|
| Jan | 9,951 | Sept | 51,309 |
| Feb | 14,908 | Oct | 48,122 |
| Mar | 17,112 | Nov | 45,787 |
| Apr | 20,419 | Dec | 71,882 |
| May | 29,620 | *1940* | |
| June | 45,599 | Jan | 109,436 |
| July | 57,290 | Feb | 113,022 |
| Aug | 54,994 | Mar | 118,820 |
| | | Apr | 127,043 |

In the Sanderlin Plan of operation, petitioner had premised case sales for fiscal 1940 as follows:

| | |
|---|---|
| 2-yr. whisky | 42,007 |
| 3-yr. whisky | 308,504 |
| 4-yr. whisky, 90-proof | 39,658 |
| 4-yr. bottled-in-bond | 94,167 |
| Blends—3 yrs | 10,701 |
| Blends—4 yrs | 5,052 |
| Total | 500,089 |

This report was subsequent in time to the cessation of production lasting until October of 1938.

During World War II, demand for Old Forester rose beyond pre-war expectations. To better meet such demand, petitioner, beginning in the fall of 1942, allocated virtually all of its own distillation to Old Forester and practically eliminated Early Times, except for nominal sales in a few markets.

During fiscal 1940, petitioner bottled as Old Forester that quantity of its own distillation of sufficient age necessary to satisfy the then actual demand. There was in addition a great latent or potential demand, but this would have to be developed by appropriate advertising, and as matters stood in fiscal 1940, was not a current, effective demand.

In the latter part of 1939 Schenley Distillers Corporation, one of the "Big Four" of the industry, changed the age of I. W. Harper, its premium bottled-in-bond bourbon comparable to Old Forester, from 4 to 5 years. Schenley did not refer to this change or mention age in advertisements nor seek in any way to exploit the fact as a selling point with the public. Neither during the base period nor at any other time pertinent have advertisements respecting any of the premium bottled-in-bond bourbons made reference to age except as hereafter noted.

Beginning in January of 1940, petitioner also began to bottle and sell some Old Forester 5 as well as 4 years of age. From January to April of 1940 petitioner's sales and inventory (in cases) available for each respective age group were as follows:

| Month (1940) | 4 years | | 5 years | |
|---|---|---|---|---|
| | Sales | Inventory | Sales | Inventory |
| January | 2,330 | 108,993 | 1,391 | 1,647 |
| February | 1,401 | 107,345 | 1,786 | 6,881 |
| March | 3,452 | 111,498 | 1,241 | 8,526 |
| April | 4,123 | 116,800 | 1,824 | 11,447 |

Petitioner's advertising of Old Forester did not mention age or attempt to present age as a selling feature, except that a reference to age on the Old Forester label was reproduced without special note or comment along with the rest of that label in advertising picturing the bottle. This reference read: "THIS WHISKY IS FOUR YEARS OLD" until the plate was changed sometime after the base period to read: "THIS WHISKY IS FIVE YEARS OLD."

During the base period the Old Forester label contained the following statement, in the reproduced handwriting of George Garvin Brown, exactly as written by him in 1870 on the founding of the old Brown-Forman organization:

This whisky is distilled by us only; and we are responsible for its richness, and fine quality. Its elegant flavor is solely due to *original fineness developed by age.* There is nothing better in the market.

The then Bureau of Internal Revenue took the position that the above reference to "age" required that the label also note the exact age of the whisky. The representation on the Old Forester label that "THIS WHISKY IS . . . YEARS OLD" was due solely to this position of the Bureau. Petitioner discontinued the phrase "BY AGE" in the early 1940's and deleted at the same time the statement as to the actual age of the whisky.

At some undisclosed time petitioner increased the age of its straight whiskies to 4 years. A memorandum in support of petitioner's section 722 claims refers to this matter in the following language:

It was not until the middle of 1940, or even later, that the industry as a whole realized that the public would demand mature whiskies over four years old even in the volume brands. * * *

The following is a schedule showing total industry withdrawals from bond for years ending June 30, from 1937 to 1949, inclusive, bottled-in-bond production by petitioner for 1937 to 1949, inclusive, based on years ending April 30, and the percentage of the former represented by the latter:

| Tax gallons withdrawn total U.S. industry bottled-in-bond | | Brown-Forman production of bottled-in-bond | | Per cent of Brown-Forman production to total bonds |
|---|---|---|---|---|
| Years ended June 30— | Gallons | Years ended April 30 | Gallons | |
| 1937 | 1,661,888 | 1937 | 52,644 | 3.2 |
| 1938 | 3,686,178 | 1938 | 111,746 | 3.0 |
| 1939 | 6,316,668 | 1939 | 143,833 | 2.3 |
| 1940 | 13,569,728 | 1940 | 132,950 | 1.0 |
| 1941 | 13,543,847 | 1941 | 219,082 | 1.6 |
| 1942 | 13,424,451 | 1942 | 259,010 | 1.9 |
| 1943 | 16,577,520 | 1943 | 554,197 | 3.3 |
| 1944 | 9,330,081 | 1944 | 706,148 | 7.6 |
| 1945 | 9,578,286 | 1945 | 590,747 | 6.2 |
| 1946 | 6,958,690 | 1946 | 715,034 | 10.3 |
| 1947 | 9,318,802 | 1947 | 859,261 | 9.2 |
| 1948 | 9,130,136 | 1948 | 854,815 | 9.4 |
| 949 | 7,788,536 | 1949 | 695,015 | 8.9 |

For the years 1934 to 1950, inclusive, disposable personal income, expenditures for distilled spirits, and the percentage of the latter to the former, in the United States, were as follows:

| Calendar year | (a) Disposable personal income (millions of dollars) | (b) Expenditures for alcoholic beverages (millions of dollars) | Proportion of (b) to (a) |
|---|---|---|---|
| | | | Per cent |
| 1934 | $51,635 | $663 | 1.3 |
| 1935 | 57,973 | 996 | 1.4 |
| 1936 | 66,095 | 1,304 | 1.9 |
| 1937 | 71,055 | 1,469 | 2.1 |
| 1938 | 65,465 | 1,396 | 2.1 |
| 1939 | 70,167 | 1,510 | 2.2 |
| 1940 | 75,743 | 1,675 | 2.2 |
| 1941 | 92,015 | 1,980 | 2.2 |
| 1942 | 116,740 | 2,685 | 2.3 |
| 1943 | 132,441 | 3,200 | 2.4 |
| 1944 | 146,957 | 3,850 | 2.6 |
| 1945 | 151,060 | 4,400 | 2.9 |
| 1946 | 158,916 | 5,060 | 3.2 |
| 1947 | 169,494 | 4,560 | 2.7 |
| 1948 | 188,352 | 3,900 | 2.1 |
| 1949 | 186,427 | 3,650 | 2.0 |
| 1950 | 204,261 | 3,870 | 1.9 |

Throughout the base period the selling price of Old Forester was identical with that of Old Grand Dad, Old Taylor, and I. W. Harper. Until early in 1938 the only whisky available for bottling in bond had been produced during prohibition under the Medicinal Spirits Act or prior to prohibition. These aged whiskies were scarce in relation to the demand, and prices ranged from $37.50 to $40 per quart case, including Federal tax. Thereafter, National Distillers had an adequate supply of its own distillation produced subsequent to repeal, and reduced the price of Old Grand Dad and Old Taylor to $23.50 per quart case, including tax. Schenley made a similar price reduction on I. W. Harper, and petitioner did so, perforce, on Old Forester. No further price reductions took place, although anticipated by the industry during 1939.

In the fiscal year ending April 30, 1940, petitioner's costs of sales for bonded and other whiskies were in the respective amounts of $5.86 and $3.31 per case. Had petitioner been able to fill its needs without outside purchases these costs would have been, respectively, $4.08 and $3.06.

On its consolidated excess profits tax return for fiscal 1942 petitioner reported and paid a tax in the amount of $1,266.35. On its separate returns for fiscal 1943 to 1946, inclusive, it reported taxes and claimed deferment of payment under section 710(a)(5) as follows:

| Fiscal year | Tax reported | Deferred |
|---|---|---|
| 1943 | $1,487,772.50 | $490,964.93 |
| 1944 | 3,039,448.63 | 1,003,018.05 |
| 1945 | 3,669,788.35 | 913,375.70 |
| 1946 | 2,985,972.58 | 336,565.89 |

Petitioner's excess profits tax liability and deficiencies as presently determined by respondent are as follows:

| Fiscal year ended April 30— | Excess profits tax liability | Assessed and paid | Deficiency |
|---|---|---|---|
| 1942 | $136,915.30 | $1,266.35 | $135,648.95 |
| 1943 | 1,471,251.84 | 980,286.91 | 490,964.93 |
| 1944 | 2,824,293.07 | 1,832,093.05 | 992,200.02 |
| 1945 | 3,290,365.24 | 2,471,543.63 | 818,821.61 |
| 1946 | 2,704,748.33 | 2,405,313.01 | 299,435.32 |

Petitioner filed applications for relief on Form 991 and related refund claims (Form 843) on the following dates:

| | 1942 | 1943 | 1944 | 1945 | 1946 |
|---|---|---|---|---|---|
| Application for relief (Form 991) | 9/13/43 | 12/21/43 | 11/15/44 | 11/15/45 | 11/15/46 |
| Amendments | 11/29/46 | 11/29/46 | 11/29/46 | 11/29/46 | 6/13/49 |
| Amendments | 6/13/49 | 6/13/49 | 6/13/49 | 6/13/49 | |
| Claim (Form 843) | 5/29/46 | 11/21/45 | 11/21/45 | 5/29/46 | 4/19/48 |
| Amendments | 6/10/49 | 5/29/46 | 5/29/46 | 6/10/49 | 6/10/49 |
| Amendments | | 6/10/49 | 6/10/49 | | |

These claims include the carryover and carryback of unused excess profits credits based upon a CABPNI as follows:

| *Year in which unused credit arises* | *Year to which carryover or carryback claimed* |
|---|---|
| *Carryovers* | |
| 1941 | 1942 and 1943 |
| 1942 | 1944 |
| 1943 | 1944 and 1945 |
| *Carryback* | |
| 1943 | 1942 |

The applications for relief under section 722 were denied by statutory notices dated May 26, 1952, in the case of fiscal 1942 and May 8, 1953, for all other fiscal years.

Petitioner's excess profits net income and excess profits credits based on invested capital under section 714 for fiscal 1942 to 1946, inclusive, are as follows:

| Fiscal year ended April 30— | E.P.N.I. invested capital method | E.P. credit invested capital method |
|---|---|---|
| 1942 | $724,711.87 | $432,593.15 |
| 1943 | 2,110,836.51 | 460,088.42 |
| 1944 | 4,069,786.88 | [1] 469,742.44 |
| 1945 | 4,851,609.29 | 495,169.31 |
| 1946 | 5,884,434.42 | 530,830.02 |

[1] Computed under 1943 law. Amount computed under 1944 law is $459,779.23.

Petitioner's excess profits net income and excess profits credits based on income, without regard to adjustments claimed for abnormal deductions under section 713, are as follows:

| Fiscal year ended April 30— | E.P.N.I. income method | E.P. credit income method |
|---|---|---|
| 1941 | $250,445.45 | $211,862.90 |
| 1942 | 645,362.51 | 257,672.58 |
| 1943 | 2,021,173.51 | 321,190.72 |
| 1944 | 3,996,859.09 | 321,190.72 |
| 1945 | 4,792,924.74 | 321,190.72 |
| 1946 | 5,846,135.99 | 321,190.72 |

Petitioner's excess profits net income for each of the base period years, without regard to adjustments claimed for abnormal deductions was as follows:

| Fiscal year ended April 30— | Brown-Forman Distillers Corp. separate return | Brown-Forman Distillers Corp. and subsidiaries, consolidated |
|---|---|---|
| 1937 | $763,032.90 | $807,800.94 |
| 1938 | 3,005.11 | (33,556.30) |
| 1939 | 88,454.78 | 44,691.47 |
| 1940 | 230,417.87 | 210,780.21 |

OPINION.

Petitioner relies solely on section 722(b)(5), and seems to premise its claim variously on (1) the absence of an "adequate" supply of aged whisky *at the beginning* of the base period, and (2) that not until October of 1938 did petitioner begin saving and aging its distillation for eventual sale as bonded whisky at least 4 years old.

The first factor is entirely without merit. Prohibition was repealed in December of 1933. According to petitioner, approximately 4 to 4½ years are required to produce and prepare for sale 4-year-old bonded whisky. Thus, not until the spring of 1938 could any American distiller have had an "adequate" supply of such whiskies of its own distillation.

Petitioner's first contention is hence untenable unless Congress intended relief for all distillers primarily engaged at all times pertinent in the production and sale of aged whiskies. While petitioner's contentions on brief are inconsistent with a class theory of relief, we do not reach this point, since the facts show that until October of 1938 petitioner was not within that class.

The record is clear that shortly after repeal and continuing as far into the base period as it could profitably do so, petitioner did not save and age its own distillation, but in fact sold it in the form of young bulk or bottled whisky, as fast as it could induce others

to buy it. Accordingly, any argument based upon a lack of aged whisky at the beginning of the base period cannot aid petitioner, as it was not within the class of taxpayers covered by that argument.

Petitioner's second attempt to come within the purview of section 722(b)(5), based essentially on the fact that in 1938 it began to save and age its distillation, seems sound. Respondent contends that this ground is within section 722(b)(4), and for that reason cannot be considered under (b)(5). We do not agree.

The Senate Report accompanying the Revenue Bill of 1942 (S. Rept. No. 1631, 77th Cong., 2d Sess.) states at pages 202–203:

5. The business of the taxpayer during the base period was adversely affected by any other factor, resulting in an average base period net income which is an inadequate standard of normal earnings, and the taxpayer's claim for relief and the application of the relief as provided in this section would not be inconsistent with the principles underlying the eligibility requirements and the conditions and limitations set forth therein. Thus, corporations which do not meet the strict eligibility requirements set forth in this section are not debarred from relief if their case is within the spirit of the statute and if its application would not be inconsistent with its principles and conditions and limitations.

An example which your committee believes illustrates this paragraph would be a taxpayer which shortly before the base period undertook a business involving the manufacture of a product requiring an extensive period for preparation or manufacture, and which had no stocks of such product on hand at the commencement of such business. Since a large portion of the base period would be devoted to preparation of the product for sale, and since sales would consequently be small or nonexistent and would not serve as a measure of the normal operations of the business, the base period would represent an abnormal standard by which to compute excess profits. Although in such a case, it might be said that the business was not depressed during the base period since it was operating at full manufacturing capacity, and thus might not be entitled to relief under paragraph 2, it would seem clear that such a taxpayer is entitled to relief by way of a constructive excess profits net income based upon more normal operations. For example, assume that a taxpayer was organized in 1935 to distill and sell whisky. It had no reserve whisky stocks on hand. During 1935 and for the greater part of its base period, it was aging the whisky it had distilled. Because of a lack of a marketable product, the sales of such taxpayer, and consequently its base period net income, were abnormally low and do not reflect results of usual operations. Relief should be extended to such taxpayer, the base period net income of which would not have been distorted if it had adequate whisky stocks on hand at the beginning of the base period.

The specific example of the whisky distiller does not fit this petitioner, since petitioner was organized in 1933, not 1935, took over an existing operation from a predecessor which had operated during prohibition under special license, and did not in fact attempt to save and age its own distillation until late in 1938. Petitioner's persistence in claiming that it does resemble that hypothetical taxpayer is not well taken.

However, that example does demonstrate that (b)(4) and (b)(5) may overlap. The distiller in the example seems clearly to have

"commenced business" "immediately prior to the base period," within the meaning of (b)(4). Yet, it is expressly stated to be entitled to relief under (b)(5). The example, of course, was intended as merely one illustration of a taxpayer entitled to relief under (b)(5), and is not all-embracing. Petitioner's failure to identify itself with that specific taxpayer is thus not fatal to its case. Cf. *Glenshaw Glass Co.*, 23 T.C. 1004.

Moreover, the words immediately preceding the example of the whisky distiller show even more clearly the consistency of applying (b)(5) to cases also within the ambit of some other subsection of 722(b). A taxpayer which "shortly before the base period undertook a business" of the nature described therein seems clearly to have commenced business, or if already in other lines of endeavor, to have changed the character of its business, immediately prior to the base period.

There seems no reason to distinguish between a taxpayer which commences a business and one which changes the character of its business, or between a commencement or change immediately prior to and one occurring during the base period. Thus, paraphrasing some of the language above quoted, we derive the following:

An example which your committee believes illustrates this paragraph would be a taxpayer which during the base period changed the character of its business to the manufacture of a product requiring an extensive period for preparation or manufacture and which had inadequate stocks of such products on hand at the time of such change. Since the remaining portion of the base period would be devoted to preparation of the product for sale, and since sales for the remainder of the base period would consequently be small or nonexistent and would not serve as a measure of the normal operations of the business, the base period would represent an abnormal standard by which to compute excess profits. Although in such a case, it might be said that the business was not depressed during the base period since it was operating at full manufacturing capacity, and thus might not be entitled to relief under paragraph 2 or 4, it would seem clear that such a taxpayer is entitled to relief by way of a constructive excess profits net income based upon more normal operations.

We conclude from the foregoing that petitioner qualifies for relief under section 722(b)(5). We must now determine the CABPNI to which it is entitled.

Petitioner's claimed CABPNI in the amount of $2,020,508 is unduly optimistic, and is based upon a number of unacceptable premises. Petitioner assumes, for example, that a shortage of aged whisky *at the beginning* of the base period justifies relief. But as we have

pointed out, petitioner was then selling young whiskies, and in fact did so quite profitably. It was not then seeking to save and age whisky, and experienced no shortage in the product it was then in the business of selling, i.e., young whiskies.

Moreover, there is no warrant for placing petitioner in a uniquely favorable position as compared to its competitors. As noted, in view of the date of repeal, no domestic distiller had or could have had any substantial quantity of 4-year-old whisky of its own distillation for sale prior to 1938. If we were to assume, contrary to fact, that petitioner had adequate stocks of such whisky at the beginning of the base period, we would have to assume the same fact for its competitors. We would thus have been required to assume a normal market, eliminating special conditions arising from a "seller's market," and would have to premise any reconstruction on the assumption that nationally there was an adequate supply of aged whisky.

In 1938, when for the first time an adequate supply of bonded whisky was available, prices fell, reaching their lowest point in 1939. At that time industry experts and petitioner's Sanderlin Plan all predicted further reductions in price. There were, in fact, no further price reductions, but we are satisfied from the entire record that this was the result of an artificial stimulation of the economy by national defense activities resulting from wartime conditions. If in fact there had been an adequate supply of whisky in 1936, we are satisfied that the price at that time would have been near the low point actually reached in 1939, and that further reductions would have taken place throughout the base period.

In our opinion, however, petitioner qualifies for relief solely because, beginning in October 1938, or during the last 18 months of its base period, it changed character and progressively increased the saving and aging of its own distillation for eventual sale as bonded whisky at least 4 years old. Any relief granted must be limited to an amount commensurate with that factual basis for such relief, and must be granted only in respect of those excess profits tax years in which petitioner actually realized additional income subject to excess profits tax as a result of the activity commenced in 1938.

Petitioner claims that in its last base period year, given adequate supply, it could have sold 235,000 cases of Old Forester. During that year petitioner in fact sold approximately 470,000 cases of all types of whiskies, of which only approximately 40,000 cases consisted of bonded whisky. Also, during that year, a substantial amount of Brown-Forman distillation actually or almost of sufficient age for bottling in bond was bottled and sold out of bond.

Petitioner was no longer beset during its fiscal year 1940 with the credit and financing difficulties which had so severely tried it in

earlier years, as the banks had by that time approved the Sanderlin Plan, and Doiseau was no longer in control. The profit on bonded whisky was so much higher than that on nonbonded whisky that we are satisfied that petitioner would not sell out of bond any of its own distillation which it could shortly expect to bottle as Old Forester, if readily salable. The Sanderlin Plan, written with full awareness of petitioners inventory situation, had prophesied for fiscal 1940 far greater sales of Old Forester than were actually realized. We find as a fact that in the last fiscal year of its base period petitioner sold all the bonded whisky that the actual market would then accept.

On the other hand, if petitioner had had substantial stocks of aged whisky, not at the start of the base period, but beginning in October of 1938, cf. S. Rept. No. 1631, *supra*, it would have known well in advance that such stocks would be available, and would have taken steps to prepare the market accordingly. This would have increased expenses, particularly advertising expenses in the earlier years, but would have reduced other expenses, and especially those involved in the repurchasing by petitioner of its own distillation, and would have resulted in substantially greater sales of Old Forester for the last 18 months of petitioner's base period than it actually realized.

The reconstruction of a taxpayer's base period net income is necessarily largely speculative. It would serve no purpose to attempt to plot out in detail every consideration and mental process involved in such reconstruction. Having reviewed the entire record, we conclude that a proper CABPNI, for those excess profits tax years for which relief is to be granted, is in the amount of $850,000.

Each of the taxable years is a separate accounting period, subject to considerations not necessarily common to all. Thus, it does not follow that because relief should be granted for one taxable year it must necessarily be granted for all years. Petitioner argues against the application of the so-called variable credit rule, contending that it is applicable only where relief is granted under section 722(b)(4). But this petitioner is being granted relief here solely because of activity commencing in October 1938. Under the circumstances, that activity could not and did not result in additional income subject to the excess profits tax until approximately 4 years thereafter.

Whether or not the variable credit rule as such is limited to (b)(4) cases, we are still bound to allow only that relief warranted by the facts, and must consider each of the taxable years before us on its own merits. Petitioner realized no additional income until its fiscal year 1943 from the activity commenced in 1938. The factual basis of petitioner's right to relief under section 722(b)(5) is thus irrelevant before its fiscal year 1943. Accordingly, petitioner is entitled to no

relief and may not use any CABPNI until such year. As to its fiscal years 1943, 1944, 1945, and 1946, petitioner is entitled to a CABPNI in the amount of $850,000 which may or may not result in any actual relief since for some of the years under consideration petitioner's tax was computed under the so-called 80 per cent rule of section 710.

Reviewed by the Special Division.

*Decisions will be entered under Rule 50.*