MAX BARNETT AND ESTHER BARNETT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 92538. Filed May 28, 1965.

*George V. Delson* and *William P. Miller*, for the petitioners.
*Lee A. Kamp*, for the respondent.

HARRON, *Judge:* Respondent determined a deficiency in income tax for 1957 in the amount of $16,189.36. The question is whether petitioner is entitled to a deduction in 1957 of $30,850.49 under section 163 (a), 1954 Code, as interest paid on indebtedness.

### FINDINGS OF FACT

Most of the facts have been stipulated. The stipulated facts are found accordingly.

Petitioners are residents of Merrick, N.Y. They filed a joint return for 1957 with the district director of internal revenue in Brooklyn, New York, on the basis of a calendar year and cash method of accounting. Since the issue relates only to Max Barnett, he is referred to herein as the petitioner.

Petitioners' 1957 return is signed by petitioners and, also, by Milton Zipper, as the person who prepared the return, and it bears a rubber stamp reading "Milton Zipper, Certified Public Accountant, 37 East Main Street, Oyster Bay, New York." Petitioners filed a joint return for 1958, a copy of which is in evidence, on which a rubber stamp is affixed with the notation, "Milton Zipper, C.P.A."

Petitioner did not appear at the trial of this case. He did not testify.

From the 1957 and 1958 returns, it is evident that Zipper is petitioners' accountant and that he prepared the returns. From several exhibits it is also evident that Zipper was known to Gibraltar, since in the account on the books of Gibraltar, opened on December 23, 1957, for the transaction in dispute, the name and style of the account is "Mr. Max Barnett, c/o Milt Zipper, Esquire, 37 Main Street, Oyster Bay, New York."

In 1957, petitioner received $50,000 as a prize as the winner of a contest conducted by a newspaper, the Journal-American in New York City; he reported the $50,000 in income on his 1957 return.

Petitioner reported on his 1957 return, income from salary in the amount of $7,825, paid by a corporation, Island Radio Dist(ributor), Inc., Hempstead, N.Y. He reported on the 1957 return, adjusted gross income in the amount of $56,845, and taxable income of $18,847.71. Included in the deductions taken is $30,850.49. It was deducted as "interest" paid to Gibraltar. Respondent disallowed the claimed deduction of $30,850.49. The reason given in the deficiency notice is that "the amount does not represent interest within the purview of section 163 of the Internal Revenue Code of 1954 and that the transaction allegedly giving rise to said claimed deduction is a transaction lacking in substance." This determination of the respondent is in issue here.

On the 1957 return, petitioner deducted $1,500 as expense connected with the preparation of the return. Respondent disallowed the deduction, but he now concedes error and agrees that this deduction can be allowed.

Gibraltar, during the pertinent period, was a dealer in municipal, State, and Federal bonds, having its offices in New York City. It maintained a checking account with Irving Trust Co. (Irving Trust) in the same city. Irving Trust maintained on its books for Gibraltar a "securities clearance" account, which is defined in the stipulation of facts as one where—

a broker, acting without sufficient cash, may purchase stock or bonds and sell them almost immediately, making a profit or commission on the transaction. He is not able to pay for the security purchase, and he, therefore, employs his bank or possibly some other broker to pay for and receive the same, and then make[s] delivery to the purchaser; the difference between the purchase and selling prices less the clearing charges to be paid to the first broker. At the time of purchas-

ing, a broker may say to the seller, "Doe & Co. will clear for me", meaning that the seller is expected to make delivery to Doe & Co. for the broker's account; the broker, in the meantime, instructing Doe & Co. as to the transaction.

The assets, liabilities, and net worth of Gibraltar as of the end of its fiscal years ending on November 30, 1956, 1957, and 1958, were as follows:

| | Nov. 30, 1956 | Nov. 30, 1957 | Nov. 30, 1958 |
|---|---|---|---|
| *Assets* | | | |
| Cash in banks | $24,401 | $32,475 | $65,202 |
| Receivable [1] | 69,599,555 | 61,551,150 | 56,506,071 |
| Securities, long | 22,614,933 | 11,403,774 | 0 |
| Other assets | 7,571 | 6,416 | 8,590 |
| Total | 92,246,460 | 72,993,815 | 56,579,863 |
| *Liabilities* | | | |
| Loans payable [2] | 109,000 | 91,800 | 583,500 |
| Accounts payable | 3,932 | 21,304 | 18,874 |
| Securities borrowed | 92,214,703 | 73,010,967 | 56,299,601 |
| Accrued expenses payable | 17,825 | 0 | 0 |
| Capital stock | 2,000 | 2,000 | 2,000 |
| Deficit | (101,000) | (132,256) | (324,112) |
| Total | 92,246,460 | 72,993,815 | 56,579,863 |

[1] Notes and accounts receivable.
[2] Secured, payable to banks.

On Friday, December 20, 1957, petitioner and Gibraltar entered into an arrangement whereby petitioner purportedly bought from Gibraltar and Gibraltar purportedly sold to petitioner on margin $750,000 face amount of 3¾-percent short-term U.S. Treasury certificates of indebtedness (certificates) issued on November 26, 1957, and due on December 1, 1958; and on that date petitioner purportedly placed an order with Gibraltar to make that "purchase" for his new account, settlement date December 23; and on that date Gibraltar mailed him a "sale confirmation" slip confirming a "sale" to him of the certificates at 100–23/32 in the principal amount of $755,390.63, plus accrued interest for 22 days, from December 1, of $1,699.86, or a total of $757,090.49. An account was opened on Gibraltar's books in petitioner's name, care of Zipper, on December 23, 1957, designated "Special Loan," and under that date the account was "charged" with the "purchase" for the account of the certificates in the amount of $757,090.49. The arrangement (i.e., the steps that were taken) was that the special loan account was opened on Gibraltar's books to reflect a purported loan by Gibraltar to petitioner for the purchase of the certificates in the net amount of $747,890.63; petitioner gave Gibraltar his check for $9,199.86 as "margin"; he executed a promissory note payable to Gilbraltar 9 months later in the above net amount, which recited that he deposited and pledged the certificates with Gibraltar as collateral security, and that it could repledge the collateral security; and he made a second payment to Gibraltar of $30,850.49, which pur-

portedly was a "prepayment" of all of the "interest" on the note for 9 months. Thus, petitioner made two payments to Gibraltar totaling $40,050.35. The details are set forth *infra*. However, on December 20 and 23, 1957, Gibraltar did not have its own cash in the amount of $757,090.49, or $747,890.63, and it did not have the certificates in its inventory.

On December 20, 1957, Gibraltar (hereinafter sometimes referred to as G) placed an order with the First Boston Corp., a dealer in Government bonds, for the purchase of $750,000 of the certificates described above at the price of 100–22/32, to be delivered on Monday, December 23, to Irving Trust against payment; and G took the following additional steps on the same day: G sent a letter to the Cleveland Trust Co. (Cleveland Trust) in Cleveland, Ohio, requesting that it should instruct its correspondent bank in New York City, the Chemical Corn Exchange Bank (Chemical), to receive on December 23 from Irving Trust the $750,000 of certificates for G's account, and to pay Irving Trust $740,000. G sent to Cleveland Trust, with the letter, G's promissory note for $740,000, payable on demand, bearing interest at the rate of 4 percent, and G requested Cleveland Trust to charge G's account for the cost of handling the transaction. G also sent a letter dated December 20, 1957, to Irving Trust, attention of its securities clearance department, to deliver on December 23 to Chemical against payment of $740,000, the $750,000 of certificates for G's account with Cleveland Trust. All of the instructions were carried out, as follows.

Boston mailed G its confirmation slip dated December 20, 1957, settlement date December 23, showing a sale to G of $750,000 certificates at the price of 100–22/32, in the principal amount of $755,156.25, plus 22 days' accrued interest $1,699.86, or a total price of $756,856.11, delivery to be made to Irving Trust against payment of the total amount on December 23; and First Boston recorded the transaction on its books as a sale, and G recorded it on its books as a purchase. On December 23, 1957, First Boston, through its agent, Manufacturers Trust Co. in New York City, delivered the certificates to Irving Trust, which paid $756,856.11 to First Boston through its agent. Irving Trust mailed to G its debit advice showing that it had received the certificates from First Boston for redelivery against payment of funds (to Chemical); had charged G a clearance charge of $7.50; and had debited G's checking account in the amount paid First Boston, plus the clearance charge, or the total amount of $756,863.61. Irving Trust, on December 23, debited G's checking account in the latter amount.

On December 23, 1957, Irving Trust delivered the certificates to Chemical for the account of Cleveland Trust, and received $740,000 from Chemical. Irving Trust on that date credited G's checking ac-

count in the above amount, and it mailed its credit advice to G showing these details.

Pursuant to the above steps, G borrowed $740,000 from Cleveland Trust on December 23, 1957, at 4-percent interest, gave its promissory note for that amount, payable on demand, and pledged as collateral security for the loan the $750,000 of certificates. On its books G recorded the receipt of $740,000 as "Loans Payable—Cleveland Trust."

The certificates delivered to Chemical were held at all times during the period of Cleveland Trust's loan in identical or equivalent form by Chemical as the correspondent bank of Cleveland Trust. Neither G, Cleveland Trust, nor Chemical sold short the certificates pledged by G with Cleveland Trust as security for the loan. It is customary for a correspondent bank to receive securities and hold them for an out-of-State bank, which is what Chemical did for Cleveland Trust in respect of the certificates in question.

On December 23, 1957, petitioner issued his check payable to G in the amount of $9,199.86, which G received and deposited in its regular bank account. G credited the special loan account in petitioner's name (mentioned above) on its books on December 23 with the above amount. The credit left a debit balance in the account of $747,890.63. The above amount, computed by G, represented the accrued interest on the certificates from December 1 to 23, 1957, $1,699.86, plus $7,500, "one point 'margin' on the face value of the Treasury Certificates."

Petitioner executed a promissory note dated December 23, 1957, payable to G 9 months later, on September 23, 1958, in the amount of $747,890.63 (the amount of the debit balance in the special loan account on G's books in his name), which account purportedly reflected a loan by G to petitioner in the amount of the note. The note is incorporated herein by reference. The note is a typed, mimeographed, or printed form, on letter-size paper (8½ by 11 inches); certain details were inserted to fill in the blank spaces; and at the end, after petitioner's signature ("Max Barnett c/o Milt Zipper," with Zipper's address), three paragraphs were added. Opposite petitioner's signature is the rubber stamp of G marking the note paid January 20, 1958. It is also marked "Accepted" by Irving Resnick, vice president of G. The note recites, *inter alia*, the following: Interest shall be charged at the rate of 5¾ percent per annum; that the undersigned (Barnett) deposits and pledges with the lender (G), as collateral security for the payment of the note, $750,000 face amount, 3¾-percent Treasury certificates due December 1, 1958; that the lender has the usual rights to sell the collateral security upon default in the payment of the note and take appropriate action to make collection; that the "Lender may repledge all or any of the collateral security for any sum not in excess of the amount due * * * at the date of such repledge with any per-

son, firm or corporation for any purpose whatsoever"; and that the term "undersigned" shall mean, *inter alia*, "the heirs, executors, * * * or assigns thereof." The three paragraphs added at the end of the note are:

Anything to the contrary herein contained notwithstanding, should the undersigned pay the total interest due hereunder within a period of thirty (30) days from the execution hereof, interest shall be charged at the rate of 5½% per annum; should the undersigned pay the total interest due hereunder after thirty (30) days from the execution hereof but prior to one hundred and twenty days from the execution hereof, interest shall be charged at the rate of 5⅝% per annum.

The undersigned has the right to prepay principal at any time and in any amount with the exception however that the minimum interest payable hereunder shall be for a period of thirty (30) days on the total principal indebtness.

Anything to the contrary herein contained notwithstanding, the lender shall not have the right to demand additional collateral unless and until the market value of the securities pledged hereunder shall be less than one point below the principal debt hereunder.

With respect to the payment and rate of interest under the note: There is no provision therein fixing a date or dates when interest shall become due and payable other than the due date of the note, September 23, 1958, 9 months after the date of execution. The 5¾ rate of interest is subject to reduction to either 5½ or 5⅝ percent, depending upon the maker's permissive election to prepay all of the 9 months' interest on the principal amount either within 30 days from the date of execution, or after 30 days but before 120 days from the execution date. The principal amount of the note may be prepaid at any time and in any amount prior to the due date, but regardless of the date and amount of any prepayment of principal, there is a minimum charge for interest equal to interest on the principal amount for 30 days at whichever rate of interest applies at the time of the payment of such "minimum amount of interest."

On December 26, 1957, petitioner paid G $30,850.49, under his check of that date, which amount purportedly was a prepayment of "interest" at the rate of 5½ percent of $747,890.63, the principal amount of the promissory note. G deposited this amount in its checking account with Irving Trust on the same date.[1] G did not credit this payment to the special loan account mentioned above. Rather, G credited it to some other account on its books and recorded the payment as "interest income." As is set forth *infra*, G refunded the total sum of $27,423.06 to petitioner in January 1958 in two payments. The payment on December 26, 1957, of $30,850.49 is the item in issue which petitioner deducted in his 1957 return as a payment of interest, which deduction was not allowed by respondent.

---

[1] This deposit is shown by the bank statement for that account (Exhibit 18–R). Par. 8 of the stipulation of facts may be in error, to the effect that G deposited this amount in its "regular" bank account. See, i.e., par. 6 of the stipulation.

The following schedule sets forth the range of the high and low prices at which the 3¾-percent certificates due December 1, 1958, were traded during the period November 26, 1957, to November 26, 1958:

| Dates | High bid | Low bid | Dates | High bid | Low bid |
|---|---|---|---|---|---|
| Nov. 26, 1957 | $100\frac{9}{32}$ | | June 1958 | $101\frac{17}{32}$ | $101\frac{3}{32}$ |
| December 1957 | $100\frac{20}{32}$ | $100\frac{8}{32}$ | July 1958 | $101\frac{3}{32}$ | $100\frac{29}{32}$ |
| January 1958 | $101\frac{5}{32}$ | $100\frac{26}{32}$ | August 1958 | $100\frac{28}{32}$ | $100\frac{10}{32}$ |
| February 1958 | $101\frac{19}{32}$ | $101\frac{3}{32}$ | September 1958 | $100\frac{19}{32}$ | $100\frac{5}{32}$ |
| March 1958 | $101\frac{19}{32}$ | $101\frac{14}{32}$ | October 1958 | $100\frac{9}{32}$ | $100\frac{5}{32}$ |
| April 1958 | $101\frac{22}{32}$ | $101\frac{16}{32}$ | November 1958 (to Nov. 26, 1958) | $100\frac{5}{32}$ | $99\frac{39}{32}$ |
| May 1958 | $101\frac{18}{32}$ | $101\frac{16}{32}$ | | | |

On January 2, 1958, settlement date January 3, G placed an order with C. J. Devine & Co. (Devine), a dealer in Government bonds, to sell $250,000 of the certificates at the price of $100\frac{26}{32}$, and to receive them from Irving Trust; and on January 2, G sent a letter to the securities clearance department of Irving Trust instructing it to pay Chemical $250,000 and received from Chemical the $250,000 of certificates; all of which was done. Also, on January 2, 1958, settlement date January 3, G sent petitioner a confirmation advice advising him that G had "purchased" from him $250,000 certificates at the price of $100\frac{25}{32}$ (not $100\frac{26}{32}$) with accrued interest from December 1, 1957, to January 3, 1958, the details of which are stated later. The next business day after January 3 was January 6.

The steps taken by Irving Trust, as shown by its advices to G, were as follows: Devine sold the $250,000 certificates at $100\frac{26}{32}$ for the principal amount of $252,031.25, plus accrued interest of $849.93, or a total amount of $252,881.18. Irving Trust, on January 6, debited G's checking account in the amount of $250,002.50, which included its clearance charge of $2.50, paid $250,000 to Chemical for the account of Cleveland Trust and received the certificates, and delivered them to Manufacturers Trust for Devine against payment of $252,881.18, which amount Irving Trust credited to G's checking account on January 6, and so advised G.

In the special loan account in petitioner's name on G's books, under date of January 3, 1958, G credited the account in the amount of $252,803.06, representing $251,953.13, at the price of $100\frac{25}{32}$, plus accrued interest from December 1, 1957, to January 3, 1958, of $849.93. These details were stated in G's confirmation advice to petitioner dated January 2, 1958.

G mailed to petitioner its "not negotiable" check dated January 3, 1958, for $3,506.18 and charged that amount to the special loan account on its books in petitioner's name. The computation of the amount is explained (in effect) on the voucher of G's check, as follows: $439.56 was the difference between the amount credited to the account as the proceeds from G's "purchase" from petitioner of $250,000 of certifi-

cates for the total amount of $252,803.06, and the "cost" allocated by G to them of $252,363.50; and G refunded $3,066.62, one-third of $9,199.86, the so-called original margin. The total of the two amounts is $3,506.18.

G also mailed petitioner a "not negotiable" check dated January 3, 1958, for $9,140.89, which was a refund of part of the $30,850.49 which petitioner had paid to G on December 26, 1957. On the voucher of the check G explained the computation of the amount. In substance it was: G allocated to the $250,000 principal amount of certificates one-third of $30,850.49, or $10,283.50. G computed, with respect to $250,000 of certificates, as the "30 day minimum as per loan agreement," $1,142.61, which G retained. G refunded to petitioner, out of $10,283.50, the sum of $9,140.89. It is stipulated that such amount ($9,140.89) was recorded on the books of Gibraltar (in some other account than the one in petitioner's name) as refund of "interest" previously "prepaid" by petitioner. G retained $20,566.99 out of the $30,850.49.

On January 17, 1958, settlement date January 20, 1958, G placed an order with Devine to sell $500,000 of the certificates at 101%32, and to receive them from Irving Trust; and G sent a letter to Cleveland Trust and another letter to the securities clearance department of Irving Trust, each dated January 17, 1958, giving instructions about the delivery of the certificates to Irving Trust. G first telephoned Ralph Holah at Cleveland Trust, in Cleveland, about the directions; the letter confirmed the oral directions. G instructed Cleveland Trust to direct Chemical to deliver to Irving Trust on January 20, 1958, $500,000 face amount of the certificates against payment of $490,000, to be credited to G's loan account with Cleveland Trust, which would constitute payment of the balance of Cleveland's demand loan to G in the amount of $740,000, made on December 23, 1957. In the letter to Irving Trust, G instructed it to receive for G's account the $500,000 of certificates and to pay Cleveland $490,000. These directions were carried out. G sent petitioner a confirmation dated January 17, 1958, settlement date January 20, 1958, advising him that it had "purchased" from him $500,000 of the certificates at 101 (not 101%32) with accrued interest from December 1, 1957, to January 20, 1958, the details of which are stated later.

The steps taken by Irving Trust, as shown by its advices to G, were as follows: Devine sold the $500,000 certificates at 101%32 for the principal amount of $505,078.13, plus accrued interest of $2,575.55, or a total amount of $507,653.68. Irving Trust on January 6, 1958, debited G's checking account in the amount of $490,005 (which included its clearance charge of $5) and paid $490,000 to Chemical for the account of Cleveland Trust, received the certificates and delivered

them to Manufacturers Trust for Devine against payment of $507,653.68, which amount Irving Trust credited to G's checking account on January 20, 1958, and so advised G.

In the special loan account in petitioner's name on G's books, under date of January 20, 1958, G credited the account in the amount of $507,575.55, representing the principal amount of $505,000, at the price of 101, plus accrued interest from December 1, 1957, to January 20, 1958, of $2,575.55. These details were stated in G's confirmation advice to petitioner dated January 17, 1958.

G mailed petitioner its "not negotiable" check dated January 20, 1958, in the amount of $8,981.80, and charged the same amount to the special loan account on its books in petitioner's name. The only explanation on the voucher of the check is "Balance due on trading account."

The detailed explanation of G's computation of the above amount is stated below, and may be understood by referring to the voucher of G's check to petitioner dated January 3, 1958, mentioned above, by which G paid petitioner $3,506.18. Prior to making the payment of $8,981.80 to petitioner, the account on G's books showed a credit balance in his favor of $8,981.80, after the credit of $507,575.55 on January 20. The payment to petitioner of $8,981.80 served to close the account, as the following shows:

| Dates | Charges | Credits | Debit balance | Credit balance |
|---|---|---|---|---|
| Dec. 23, 1958 | $757,090.49 | $9,199.86 | $747,890.63 | 0 |
| Jan. 3, 1958 | 3,506.18 | 252,803.06 | 498,593.75 | 0 |
| Jan. 20, 1958 | 0 | 507,575.55 | 0 | $8,981.80 |
| Jan. 20, 1958 | 8,981.80 | 0 | 0 | 0 |

Petitioner had paid G on December 23, 1957, the amount of $9,199.86. By its check for $3,506.18, on January 3, G refunded $3,066.62 of that amount and had retained the difference in the amount of $6,133.24. By its check dated January 20 in the amount of $8,981.80, G refunded $6,133.24 to petitioner, and paid him, in addition, the amount of $2,848.56, which represented the difference between the proceeds of $507,575.55, which was credited to the account as the proceeds of G's purported purchase of $500,000 of the certificates from petitioner, and a "cost" allocated to them by G in the amount of $504,726.99.

G also sent petitioner a second check dated January 20, 1958, in the amount of $18,282.17, which represented a refund of $18,282.17 out of the $30,850.49 which petitioner had paid G on December 26, 1957. On the voucher of this check, G gave the following explanation, in effect, of its computation (which, however, contains two incorrect figures; the errors are corrected in the following explanation) : G allo-

cated to the $500,000 principal amount of certificates two-thirds of $30,850.49, or $20,566.99. G computed as the "30 day minimum as per loan agreement" $2,284.82, which G retained. G refunded to petitioner $18,282.17, the difference between the two latter figures above. It is stipulated that the $18,282.17 was recorded on the books of Gibraltar (in some account other than the one in petitioner's name) as a refund of "interest" previously "prepaid" by petitioner.

The following details and schedules summarize the several steps which made up the transaction between petitioner and G, and G's handling of the whole matter: [2]

In the special account in petitioner's name on G's books, the initial charge to the account was in December 1957 for $750,000 face amount of certificates, but in January 1958 G disposed of them in two lots of $250,000 and $500,000. In order to obtain certain figures which entered into some of the credits to the account in 1958 and checks of G to petitioner, it is necessary to break down total figures to obtain for each lot of certificates the principal amount and the interest which had accrued on them at the time of acquisition in December 1957. G charged the special account on December 23, 1957, $757,090.49, representing the principal amount of $755,390.63, plus interest accrued from December 1 to December 23, 1956, of $1,699.86. The two latter figures are broken down to show the charges per books to the special account for the principal amounts of $250,000 and $500,000 of certificates and the interest accrued on each principal amount:

| Certificates | Price | Principal amount | Accrued interest to Dec. 23, 1957 | Total |
|---|---|---|---|---|
| $250,000 | 100²³⁄₃₂ | $251,796.88 | $566.62 | $252,363.50 |
| $500,000 | 100²³⁄₃₂ | 503,593.75 | 1,133.24 | 504,726.99 |
| $750,000 | 100²³⁄₃₂ | 755,390.63 | 1,699.86 | 757,090.49 |

G disposed of $250,000 of certificates and with respect thereto credited on January 3, 1958, to the special account, $252,803.06 representing the principal amount (at 100²⁵⁄₃₂) of $251,953.13, plus interest accrued from December 1, 1957, to January 3, 1958, in the amount of $849.93. The following shows the "gain" and the interest which accrued on those certificates between December 23, 1957, and January 3, 1958:

---

[2] The parties submitted as part of the stipulation of facts many documents which are copies of Gibraltar's records. However, they did not in their stipulation of facts provide the Court with the breakdown of many figures appearing in certain exhibits, which they could have done, and in the absence of their doing so, the Court has made the analyses and breakdowns of certain figures which, for clarity and accuracy, are necessary. Furthermore, in par. 31 of the stipulation of facts there are obvious errors in certain figures. They have been corrected by the Court; the correct figures are indicated by certain exhibits.

| | | |
|---|---|---:|
| 1/ 3/58 | Principal amount credited by G_____ | $251,953.13 |
| 12/23/57 | Principal amount charged by G_____ | 251,796.88 |
| 1/ 3/58 | Net amount credited as "gain"_____ | 156.25 |
| 1/ 3/58 | Interest accrued 12/1/57 to 1/3/58_____ | 849.93 |
| 12/23/57 | Interest accrued 12/1/57 to 12/23/57_____ | 566.62 |
| 1/ 3/58 | Increase in accrued interest credited_____ | 283.31 |

G's check to petitioner and credit to the account on January 3, 1958, included $439.56, consisting of "gain" of $156.25, plus accrued interest of $283.31.

G disposed of $500,000 of certificates and credited the special account on January 20, 1958, with $507,575.55, representing the principal amount of $505,000 (at 101), plus interest accrued from December 1, 1957, to January 20, 1958, in the amount of $2,575.55. The following shows the "gain" and the interest which accrued on these certificates between December 23, 1957, and January 20, 1958, as credited to the special account:

| | | |
|---|---|---:|
| 1/20/58 | Principal amount credited by G_____ | $505,000.00 |
| 12/23/57 | Principal amount charged by G_____ | 503,593.75 |
| 1/20/58 | Net amount credited as "gain"_____ | 1,406.25 |
| 1/20/58 | Interest accrued 12/1/57 to 1/20/58_____ | 2,575.55 |
| 12/23/57 | Interest accrued 12/1/57 to 12/23/57_____ | 1,133.24 |
| 1/20/58 | Increase in accrued interest credited_____ | 1,442.31 |

G's check to petitioner and the credit to the account on January 20, 1958, included $2,848.56, consisting of "gain" of $1,406.25, plus accrued interest of $1,442.31.

According to the credits made by G to the special account in 1958 with respect to the $750,000 of certificates, the total amounts credited thereto as "gain," and as interest accrued on each lot of certificates from December 23, 1957, to January 3 and 20, 1958, respectively, were:

| | "Gain" | Accrued interest | Total |
|---|---:|---:|---:|
| $250,000_____ | $156.25 | $283.31 | $439.56 |
| $500,000_____ | 1,406.25 | 1,442.31 | 2,848.56 |
| Total_____ | 1,562.50 | 1,725.62 | 3,288.12 |

G refunded to petitioner in two payments in January 1958 all of the deposit of $9,199.86 which he made on December 23, 1957, namely $3,066.62 on January 3 and $6,133.24 on January 20. These refunds were "charges" to the special account. The following shows the break-

downs of the charges and the credits to the special account relating to the foregoing:

| Dates | Items | Credits and paid in | Charges for paid out |
|-------|-------|---------------------|----------------------|
| Dec. 23, 1957 | Deposit | $9,199.86 | 0 |
| Jan. 3, 1958 | Refund | | $3,066.62 |
| Jan. 20, 1958 | | | 6,133.24 |
| Jan. 3, 1958 | "Gain" | 156.25 | 156.25 |
| Jan. 20, 1958 | do | 1,406.25 | 1,406.25 |
| Jan. 3, 1958 | Accrued interest | 283.31 | 283.31 |
| Jan. 20, 1958 | do | 1,442.31 | 1,442.31 |
| Total | | 12,487.98 | 12,487.98 |

Petitioner paid G on December 26, 1957, $30,850.49 as a "prepayment" under his note of "interest" for the 9-month period from December 23, 1957, to the date stated thereon as the "due date," September 23, 1958. G made refunds to petitioner of $9,140.89 and $18,282.17, or the total sum of $27,423.06; and G retained $3,427.43 as the 30-day minimum charge, i.e., $1,142.61, from December 23, 1957, to January 3, 1958, and $2,284.82, from December 23, 1957, to January 20, 1958:

| Dates | Item | Credit, paid to G | Refund | Charged by G |
|-------|------|-------------------|--------|--------------|
| Dec. 26, 1957 | "Prepayment" | $30,850.49 | 0 | 0 |
| Jan. 3, 1958 | Refund and charge | | $9,140.89 | $1,142.61 |
| Jan. 20, 1958 | do | | 18,282.17 | 2,284.82 |
| Total | | 30,850.49 | 27,423.06 | 3,427.43 |

G charged petitioner as interest in 1958, a 30-day minimum charge at 5½ percent on the principal amount of $747,890.63, the sum of $3,427.43. G credited to the special account and paid petitioner $3,288.12 (short-term capital gain, $1,562.50, plus interest accrued on the certificates during the periods involved in the transaction, $1,725.62):

Charged by G in 1958 as 30-day minimum _____ $3,427.43
Credited by G and paid to petitioner _____ 3,288.12

Petitioner's expense _____ 139.31

Petitioner was out of pocket $139.31 when the special account on G's books was closed on January 20, 1958, as the result of the transaction.

Since all of the certificates were with Chemical for the account of Cleveland Trust during all of the time involved in the whole transaction, neither G nor petitioner collected and received any of the interest that accrued on them under any payment by the U.S. Treasury Department; the certificates were acquired from First Boston and subsequently acquired by Devine as certificates having accrued interest.

The amounts representing accruals of interest on the two lots ($250,000 and $500,000) were reflected in the payments to First Boston and the payments by Devine; which amounts were reflected in the respective debits and credits to the checking account of G on the books of Irving Trust; and, in turn, were reflected in the charges and credits by G to the special account on its books in the name of petitioner; and G included the amounts set forth above for interest accrued on the certificates in two checks payable to petitioner. In this way petitioner received $1,725.62 purportedly as interest on the certificates which accrued during each period that Chemical held $250,000 and $500,000 of the certificates.

In the return filed for 1958, petitioner reported two items as interest income, and an amount as short-term capital gain on the sale of $750,000 face amount of certificates: He reported incorrectly as "income from interest" (p. 3 of the return, Schedule B), as the amount which G refunded out of the $30,850.49, the sum of $27,263.97. Actually, G had refunded $27,423.06. He reported in addition, as income from interest, $1,725.62, which G had paid him as interest accrued on the certificates.[3] And he reported as short-term capital gain from the purchase and sale of the certificates, the amount of $1,562.50, the total of G's credits to the special account, which was paid to petitioner.

The evidence does not show exactly what the nature of Gibraltar's business was in December 1957 and January 1958, or what it is in general, or the scope and variety of its services and transactions to all and various customers. The parties, in their stipulation of facts, have referred to a case decided by this Court, *Gordon MacRae*, 34 T.C. 20 (1960), affirmed on the same type of issue as is involved here, 294 F. 2d 56 (C.A. 9, 1961), certiorari denied 368 U.S. 955 and 1005, where certain transactions of Gibraltar in 1953 are described (pp. 22–26), and it is found (p. 22) that "All 'loans' on Gibraltar's books" during the period involved in that case "arose through transactions similar to those of petitioner [MacRae]." The parties have stipulated (par. 35) that "Gibraltar engaged in a substantial number of transactions similar to the type described in *Gordon MacRae*, 34 T.C. 20 (1961 [sic])."

Gibraltar is not a member of the New York Stock Exchange or any stock exchange.

The $750,000 face amount of certificates were not purchased in petitioner's name; they were purchased in Gibraltar's name; and when they were sold in January 1958, they were sold in Gibraltar's name.

Gibraltar never actually or physically had in its inventory or possession any of these certificates. They passed from one correspondent bank to another, each bank being an agent. They were held by Chemi-

[3] In par. 31 of the stipulation of facts, the parties incorrectly stated that the total amount of interest income reported for the two items was $29,989.59. The correct figure, per the return, is $28,989.59.

cal Corn Exchange Bank in New York City, the correspondent bank of Cleveland Trust; and Chemical Corn Exchange delivered them to Manufacturers Trust Co. in New York, the agent of C. J. Devine & Co., when they were sold by Devine in January 1958. Gibraltar never received any of the interest which accrued on the certificates.

Petitioner was not known personally by any officer of Gibraltar. Milton Zipper, his accountant, made all of the arrangements with Gibraltar which are involved in the issue here.

Gibraltar prepared the 9-months' note dated December 23, 1957, which was signed by petitioner "Max Barnett, c/o Milt Zipper." That note was not endorsed by any endorser for petitioner. There is no evidence to the effect that Gibraltar ever looked into petitioner's net worth and financial responsibility.

Petitioner did not have any contacts with Cleveland Trust with respect to a loan by that bank. Gibraltar frequently obtained loans from Cleveland Trust. Gibraltar made all of the arrangements for Cleveland Trust's loan to Gibraltar of $740,000 on December 23, 1957. Cleveland Trust did not refund any money to petitioner in connection with the transaction involved here.

### ULTIMATE FINDINGS OF FACT

Petitioner did not have any control at any time over the $750,000 of certificates.

Petitioner has failed to prove that at any time he exercised control over the whole transaction with Gibraltar or any part thereof.

Zipper took into account the income tax advantages to petitioner of the arrangements which Zipper made with Gibraltar, which are in issue here.

Petitioner has failed to prove that the arrangements with Gibraltar, as far as he was concerned, amounted to anything more than a paper transaction evidenced by bookkeeping entries on Gibraltar's books.

Petitioner has failed to prove that the arrangements with Gibraltar had any substance and *bona fides* apart from providing the basis for a purported prepayment of purported interest on December 26, 1957, for income tax purposes.

As a payment of interest, the transaction of petitioner with Gibraltar was a sham. Petitioner did not pay interest on indebtedness to Gibraltar on December 26, 1957, in the amount of $30,850.49, within the meaning of section 163(a).

Petitioner did not have any out-of-pocket expenses in 1957 in connection with the transaction with Gibraltar. Such out-of-pocket expenses as eventually occurred in that transaction, in the net amount of $139.31, occurred in 1958. Such expenses were not incurred in a transaction entered into for profit.

OPINION

The question is whether the sum of $30,850.49, which petitioner paid to Gibraltar on December 26, 1957, comes within the scope of section 163(a), 1954 Code,[4] as interest paid on indebtedness and, therefore, is deductible.

The respondent disallowed the deduction on the ground, as stated in the deficiency notice, that the transaction allegedly giving rise to the claimed deduction was a transaction lacking in substance and that the amount paid to Gibraltar does not represent interest within the purview of section 163(a).

Respondent contends that the purported loan by Gibraltar to petitioner of $747,890.63 was a sham; that as between Gibraltar and petitioner the whole transaction was a paper transaction of the Livingstone type (*Eli D. Goodstein*, 30 T.C. 1178, affd. 267 F. 2d 127); and that upon the record here the payment of $30,850.49 in December 1957 was part of a sham transaction, and that payment cannot be recognized for tax purposes as interest paid on indebtedness within the meaning and scope of section 163(a).

Respondent relies on the following: *Joseph H. Bridges*, 39 T.C. 1064 (1963), affd. 325 F. 2d 180; *Knetsch* v. *United States*, 364 U.S. 361 (1960); *Goodstein* v. *Commissioner*, 267 F. 2d 127, affirming 30 T.C. 1178; *MacRae* v. *Commissioner*, 294 F. 2d 56, affirming in part 34 T.C. 20; *Danny Kaye*, 33 T.C. 511, affd. 287 F. 2d 40; *J. George Gold*, 41 T.C. 419; *Lynch* v. *Commissioner*, 273 F. 2d 867, affirming 31 T.C. 990 and *Leslie Julian*, 31 T.C. 998; *Morris R. DeWoskin*, 35 T.C. 356; *Rubin* v. *United States*, 304 F. 2d 766. He relies, also, upon principles established by *Deputy* v. *DuPont*, 308 U.S. 488, and *Griffiths* v. *Helvering*, 308 U.S. 355.

Respondent does *not* concede in this case that the transaction between Gibraltar and petitioner was real, valid, and bona fide, cf. *L. Lee Stanton*, 34 T.C. 1, 7, 11, and argues that *Stanton* on its facts is distinguishable.

Petitioner relies on the form of the transaction and contends that the same result should be reached here as was reached in *L. Lee Stanton*, *supra*.

Petitioner contends that the transaction with Gibraltar was not a sham transaction, but was a bona fide one in which petitioner, on December 20, 1957, purchased from Gibraltar $750,000 face amount of U.S. Treasury certificates on margin, paying $9,199.86 as margin, and thereafter sold them to Gibraltar, $250,000 on January 2, 1958, and $500,000 on January 17, 1958, using the proceeds of the sales to pay his note to Gibraltar.

---

[4] SEC. 163. INTEREST.

(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

Petitioner admits that his desire to reduce his income taxes was a substantial factor in his paying $30,850.49 to Gibraltar on December 26, 1957, which he contends represented prepaid interest for 9 months on the note due in 9 months that he gave to Gibraltar in the amount of $747,890.63, but he argues that his tax-saving motive cannot be the basis for disallowing the deduction claimed as a deduction for interest.

This Court recognizes and agrees that a taxpayer has the right to decrease what would otherwise be his taxes by means which the law permits. This concept has been recognized by courts generally since at least *Gregory* v. *Helvering, supra*. But the *Gregory* case, as well as others cited herein, requires that the reduction be accomplished by means which the statute intended to provide. *Knetsch* v. *United States, supra*. In *Joseph H. Bridges, supra* at 1075–1076, we said:

Thus, the determination of whether petitioner's claimed deductions fall within the ambit of the statutory provision requires that we first look beyond the form in which petitioner cast the transactions to see "whether what was done, apart from the tax motive, was the thing which the statute intended." *Gregory* v. *Helvering, supra; Knetsch* v. *United States, supra; Amor F. Pierce*, 37 T.C. 1039 (1962), affirmed per curiam 311 F. 2d 894 (C.A. 9, 1962) ; *Perry A. Nichols*, 37 T.C. 772 (1962), affirmed per curiam 314 F. 2d 337 (C.A. 5, 1963). Neither the labels which the parties have assigned to the payments nor the bookkeeping entries in their records are conclusive on this point. *George G. Lynch*, 31 T.C. 990 (1959), affd. 273 F. 2d 867 (C.A. 2, 1959).[8] [Footnote omitted.]

See also *J. George Gold, supra* at 426–427.

Respondent's determination is prima facie correct. Petitioner had the burden of proving that it is in error. Petitioner's burden involved proving that the payment in issue, $30,850.49, constituted interest on indebtedness within the meaning of section 163(a).

A careful analysis of the whole record and of the transaction between Gibraltar and petitioner convinces us that petitioner has failed to establish that the payment in issue made by petitioner to Gibraltar was, in fact, interest within the meaning of section 163(a). In analyzing the transaction for this purpose, we have considered it from its inception in December 1957, until it was closed about 30 days later in January 1958, as we believe must be done to arrive at a correct conclusion. See *Joseph H. Bridges, supra* at 1076; and *Gordon MacRae*, 34 T.C. 20, 26, affirmed in part 294 F. 2d 56, where we held (in another sort of transaction of a taxpayer with Gibraltar) that the transaction must be considered as a whole: "But we may not thus fragmentize the transactions here under consideration and view each step thereof as though independent of those which went before and those which followed."

We find the instant proceeding indistinguishable in principle from an ever-lengthening line of decisions reaching like results in a variety of situations comparable to the one before us. See *J. George Gold, supra* at 427, and the 21 cases cited there, which include those already cited hereinbefore and the following: *Broome* v. *United States*, 170 F.

Supp. 613 (Ct. Cl.); *Weller* v. *Commissioner*, 270 F. 2d 294 (C.A. 3), affirming 31 T.C. 33 and *W. Stuart Emmons*, 31 T.C. 26, certiorari denied 364 U.S. 908; *Becker* v. *Commissioner*, 277 F. 2d 146 (C.A. 2), affirming a Memorandum Opinion of this Court; *United States* v. *Roderick*, 290 F. 2d 823 (C.A. 5); *Sonnabend* v. *Commissioner*, 267 F. 2d 319 (C.A. 1), affirming per curiam a Memorandum Opinion of this Court; *Egbert J. Miles*, 31 T.C. 1001; *Empire Press, Inc.*, 35 T.C. 136; and *William R. Lovett*, 37 T.C. 317. Except for immaterial variances as to names, amounts, the securities, and the forms of the transactions, this case comes within the principle of the cited authorities, and the holding in those cases that the transaction was a sham with respect to the purported payment of interest is controlling here. In *Knetsch* v. *United States, supra*, it was held that amounts claimed as "interest" could not be deducted where the transaction which gave rise to the claimed deduction was a sham. *Morris R. DeWoskin, supra* at 362.

The record fails to establish that petitioner actually borrowed $747,890.63 from Gibraltar, or actually purchased $750,000 face amount of Treasury certificates. Although there were such amounts of identifiable certificates, they were never in the actual possession of Gibraltar and the evidence does not show that petitioner ever acquired any ownership of or control over such certificates for a period of a moment. The various documents in evidence merely give a misleading appearance of a purchase of the certificates by petitioner. Looking through the form and facade of the instruments themselves, there is no more than Gibraltar's bookkeeping entries, as far as petitioner was concerned. The certificates found themselves in the hands of Chemical Corn Exchange Bank in New York, the correspondent bank and agent of Cleveland Trust, and later in the hands of Manufacturers Trust Co. in New York, the correspondent bank and agent of Devine & Co. The money used to acquire the certificates on the market belonged to Cleveland Trust, which made funds available for a short time, altogether less than and not more than 30 days. Irving Trust acted as a clearance agent for the usual fee. The certificates were held for the account of Cleveland Trust by Chemical to secure Cleveland Trust's funds, and Cleveland Trust received its funds out of the proceeds of the disposition of the certificates. Gibraltar, the alleged lender of funds to petitioner, had no money and it did not forbear or permit the use of its money as a result of the round robin in which the banks, Cleveland Trust and Irving Trust, engaged. Cf. *Broome* v. *United States, supra*; *Lynch* v. *Commissioner, supra*.

To be sure, each of the steps set in motion by Gibraltar, carried out by Irving Trust and Cleveland Trust, which had no dealings with petitioner, if viewed separately, constituted normal business activities, similar to many real and substantial transactions consummated on any given business day. But we may not breathe life into the whole lifeless

and unfragmentized transaction between petitioner and Gibraltar by transfusing it with the activities of the banks in their separate transactions. We cannot regard the whole transaction, as constructed by Gibraltar for petitioner's benefit, as one which consisted only of the steps followed by the banks (real enough in themselves as separate steps), and fail to take into account the steps followed by Gibraltar and petitioner before and after the steps taken by the banks. Using the analysis made by this Court of a similar plan in *Gordon MacRae*, *supra* at 27, in the context of the whole transaction between Gibraltar and petitioner, the steps taken by the banks, each in itself a legitimate commercial operation, were but mirror images which added up to zero as far as petitioner was concerned. The method and form used by Gibraltar in the instant case was a method of doing nothing more than to erect the facade on which petitioner now relies.

In form, petitioner executed a note in Gibraltar's favor purporting to obligate himself to pay Gibraltar $747,890.63, and "interest." The note recited that he had purportedly deposited and pledged $750,000 face amount of certificates with Gibraltar as of December 23, 1957. As of that date, the certificates had a market value of $756,856.11, including the then-accrued interest on the certificates. This purported note was not evidence of any real personal obligation of petitioner. The certificates themselves, which neither petitioner nor Gibraltar ever had, were the security for the funds used by the banks in their dealings. Certainly the transaction as set up on Gibraltar's books, including the formal note prepared by Gibraltar, merely provided the facade of a loan, and so far as petitioner was concerned the transaction did "not appreciably affect his beneficial interest," *Gilbert* v. *Commissioner*, 248 F. 2d 399 (dissenting opinion) ; *Bridges* v. *Commissioner*, 325 F. 2d 180, 184; *Knetsch* v. *United States, supra*, except to reduce his cash by the net amount of $139.31, and reduce his tax. *Joseph H. Bridges, supra* at 1077.

Nor does the fact that petitioner deposited some cash with Gibraltar, $9,199.86 on December 23, 1957, and $30,850.49 on December 26, 1957 (all of which was refunded to him except $139.31), provide the necessary substance for the whole transaction with Gibraltar. In *Deputy* v. *DuPont, supra*, it was pointed out by the Supreme Court that "although an indebtedness is an obligation, an obligation is not necessarily an 'indebtedness' within the meaning of section 23(b) [the statute]. * * * Nor are all carrying charges 'interest.'" What was intended by section 163(a) was to create a deduction for interest paid or accrued on *indebtedness—genuine* indebtedness. Here there was no real purchase of certificates *by petitioner* and no genuine indebtedness of petitioner to Gibraltar. Bookkeeping entries, although evidence of transactions they purport to record, are not conclusive. *Doyle* v. *Mitchell Bros. Co.*, 247 U.S. 179; *Lynch* v. *Commissioner, supra* at 871–872;

*Malden Knitting Mills*, 42 T.C. 769; *Bornstein* v. *Commissioner*, 334 F. 2d 779.

Petitioner seeks to distinguish the instant transaction with Gibraltar as a margin transaction, contending that petitioner put up a 1-point margin of $7,500, plus accrued interest on the certificates of $1,699.86, or a total of $9,199.86; and he argues that the other aspects of the transaction with Gibraltar, namely, the pledging of the certificates as collateral for the balance of the purchase price, were the same as in the ordinary transaction involving a purchase of securities on margin. It must not be overlooked that the burden of proof is upon petitioner, and we will not assume facts in his favor without satisfying evidence, particularly in circumstances such as those disclosed by this record. *J. George Gold, supra* at 426. Cf. *Carl Shapiro*, 40 T.C. 34, 39. There is no evidence whatsoever in the record before us to support the contention that the transaction with Gibraltar constituted a bona fide margin transaction in Treasury certificates, other than the self-serving designation by Gibraltar of the payment of $9,199.86 as "margin."

It is generally known that the purchase of securities on margin is subject to specific regulation prescribed by particular stock exchanges and the Securities and Exchange Commission (SEC) and that such regulations vary depending upon various factors. Gibraltar, in the period involved here, was not a member of the New York Stock Exchange or any other stock exchange, and as far as the record here shows, it was not subject to any such regulations. Its business operations included that of the services of a money broker, and it had established relations with banks out of New York City, such as Cleveland Trust, for obtaining funds from them for various purposes. Gibraltar resorted to its money broker contact with Cleveland Trust in Gibraltar's transaction with petitioner, but there is no evidence that Gibraltar's arrangements as between itself and petitioner constituted in fact a real and bona fide margin transaction. No one from Cleveland Trust testified and there is nothing in the record to show what the limits might have been, or the reasons for them, respecting the amount of money Cleveland Trust would or could have made available in the arrangements with Gibraltar respecting the certificates which immediately came under Cleveland Trust's control. Absent proof respecting the allegation that the Gibraltar-petitioner transaction was a real and bona fide margin purchase of certificates *by petitioner*, and in the context of the entire record in this case, the contention that it was a margin transaction must be rejected as without merit. Upon the whole record, this detail of a cash deposit by petitioner, all of which was refunded within 30 days, is merely part of the form and framework devised by Gibraltar, which we have concluded was, with respect to the claimed interest deduction, a sham.

A careful weighing of the evidence convinces us that there was no genuine indebtedness established between petitioner and Gibraltar. Despite his assertion that he was borrowing close to three-fourths of a million dollars from Gibraltar, no officer or employee of Gibraltar ever met or talked with petitioner. As between Gibraltar and Cleveland Trust, we believe it is clear that the bank looked to the Treasury certificates (and not to Gibraltar or a customer of Gibraltar as a purported debtor) to recover funds which had been supplied by Cleveland Trust to acquire the certificates.

In the transaction between petitioner and Gibraltar, Gibraltar provided the service of providing the color and form for petitioner's claim for a deduction for alleged interest, and received a "commission" for its services. The commission, which is customary, was represented by differentials fixed by Gibraltar in debiting petitioner's account with $234.38 more than the market price of the $750,000 of certificates on December 23, 1957, and in crediting it with a little less than the market prices on January 3 and 20, 1958, when two lots of $250,000 and $500,000 were transferred, namely, $78.12 and $78.13, respectively. These differentials in Gibraltar's favor totaled $390.63.

Finally, consideration is given to whether petitioner's transaction with Gibraltar did or did not "appreciably affect his beneficial interest except to reduce his tax," and what the possibilities were in that regard. *Knetsch* v. *United States, supra* at 366; *Bridges* v. *Commissioner, supra* at 184.

It is apparent that petitioner could not have expected to realize profit out of the transaction with Gibraltar, and that no profit from a differential in interest rates or appreciated value could have been realized. Petitioner did not introduce any evidence to show that the transaction with Gibraltar was one entered into for profit. Any possible profit realized would have been *de minimis* without regard for the tax-saving aspects.

In all of the facts and circumstances, there is the strong indication that the transaction with Gibraltar was destined from the beginning to produce no economic gain except a substantial reduction in petitioner's taxes, and that he was insulated from any appreciable gain or loss except for that built into the arrangement. Nothing in the record here is persuasive to the contrary. *Bridges* v. *Commissioner, supra* at 184; *Knetsch* v. *United States, supra* at 366.

Upon the entire record, the only conclusion we can reach is that there was nothing of substance to be realized by petitioner from the transaction in question without regard for and except for the tax deduction—the favorable tax consequences. It is obvious that petitioner did not have and could not reasonably have had any purpose or intention, in entering into the transaction, to appreciably affect his

beneficial interest except to reduce his taxes, and nothing in the record establishes anything to the contrary.

Petitioner's primary reliance for his claimed interest deduction is upon *L. Lee Stanton, supra*. This case is distinguishable from *Stanton* because there (p. 7) the Commissioner conceded that the transactions were bona fide and real and created genuine indebtedness, and this Court found that the taxpayer undertook the risk of the rise and fall of the market. See *Joseph H. Bridges, supra* at 1079; and *Bridges* v. *Commissioner, supra* at 185. Such cases as the following, on which petitioner also relies, are also distinguishable from this case not only because they involved different statutes but also because in each of those cases the courts found the transactions to be in substance what they appeared to be in form and to have commercial reality: *Maysteel Products, Inc.* v. *Commissioner*, 287 F. 2d 429, reversing 33 T.C. 102; *Fabreeka Products Co.* v. *Commissioner*, 294 F. 2d 876, reversing 34 T.C. 290, and *Jack L. Sherman*, 34 T.C. 303, and *Sadie S. Friedman*, 34 T.C. 456.

The payment of $30,850.49 does not qualify as interest paid on indebtedness within the intendment of section 163(a) and deduction thereof must be disallowed.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

FAY, *J.*, dissenting: The majority found that petitioner failed to prove that his various transactions with Gibraltar were genuine and bona fide. However, I believe that the record clearly indicates (1) petitioner borrowed $750,000 from Gibraltar which he used to purchase United States Treasury certificates of indebtedness; (2) petitioner owned and used said Treasury certificates as collateral security for the repayment of his borrowings; and (3) petitioner actually paid interest with respect to the aforesaid borrowings. See my dissent in *Kapel Goldstein*, 44 T.C. 284 (1965).

In finding that petitioner failed to meet his burden of proof that a genuine indebtedness was created, the majority, in effect, wields said burden as a cudgel to strike down artful schemes producing tax benefits. The burden of proof provides no such tool. I envision such usage as subverting Rule 31(b) (1), Tax Court Rules of Practice,[1] and ultimately placing an untoward burden on this Court and the judicial function we serve. In attempting to meet such a swollen concept of the burden of proof, a taxpayer will feel constrained to introduce the

---

[1] RULE 31. EVIDENCE AND THE SUBMISSION OF EVIDENCE

 (b) *Stipulations.*—

  (1) *Stipulations required.*—The Court expects the parties to stipulate evidence to the fullest extent to which complete or qualified agreement can be reached including all material facts that are not or fairly should not be in dispute.

testimony of all witnesses whose testimony may relate to his case, regardless of how tangential or remote such testimony may be.

The majority opinion stresses the absence of a reasonable profit motive on petitioner's part. Moreover, it asserts: "Petitioner did not introduce any evidence to show that the transaction with Gibraltar was one entered into for profit." It must be borne in mind, however, that, unlike other deduction provisions, section 163 does not require that the expenditure be incurred in connection with a transaction entered into for profit. Therefore, I believe that the majority places an unjustifiable limitation upon the treatment of interest which cannot be reconciled with section 163,[2] absent congressional guidance in this direction. See *Commissioner* v. *Brown*, 380 U.S. 563 (1965).

The majority goes on to state: "Any possible profit realized would have been *de minimis* without regard for the tax-saving aspects." With regard to this statement, I refer to Mr. Justice Harlan's concurring opinion in *Commissioner* v. *Brown*, *supra*, wherein he stated:

Were it not for the tax law, the [taxpayer's] transaction * * * would make no sense * * *. However the tax laws exist as an economic reality in the businessman's world, much like the existence of a competitor. Businessmen plan their affairs around both, and a tax dollar is just as real as one derived from any other source. * * *

HOYT, *J.*, dissenting: I must respectfully dissent from the majority opinion.

I cannot escape the conclusion that here the majority has adopted the general philosophy that we should not recognize a transaction which aside from any tax effects would produce an economic *loss* but which—because of the way the Internal Revenue Code is structured—produces a net economic gain solely as a result of decreased taxes. However, without plainly stating that it is adopting and applying this philosophy in deciding the instant case, the majority instead has made an effort to interpret the facts in such a way as to avoid a forthright statement of its position. By concluding that there was actually no bona fide indebtedness here, i.e., that the transaction was really a Livingstone-type sham, I sense that we are adopting the rationale *sub silentio*. This has led to conflicting findings of fact and a conclusion (that there was no real indebtedness) which I feel is clearly erroneous.

There appear to be distinct conflicts in certain of the Court's findings. At one point there is a finding to the effect that Irving Trust, Gibraltar's New York bank, received the certificates here involved, purchased by Gibraltar from First Boston Corp. Pursuant to Gibral-

---

[2] See *L. Lee Stanton,* 34 T.C. 1 (1960).

tar's instructions, Irving Trust, obviously acting as Gibraltar's bank and agent, delivered the certificates to Chemical, the New York correspondent bank of Cleveland Trust, from which Gibraltar borrowed the funds on its promissory note with which to purchase the certificates.

Later on in the findings the majority opinion states flatly, however, that "all of the certificates were with Chemical for the account of Cleveland Trust during all of the time involved in the whole transaction" and "Gibraltar never actually or physically had in its inventory or *possession* any of these certificates." (Emphasis supplied.) I am unable to reconcile these findings and it appears to me to be an inescapable conclusion that there were existing certificates purchased by Gibraltar for petitioner's account from First Boston and delivered to Gibraltar's New York bank per Gibraltar's instructions. It seems equally clear to me that there was a loan from Gibraltar to petitioner evidenced by petitioner's note; there was in turn a loan from Cleveland Trust to Gibraltar, funds were transferred pursuant thereto and used to pay the purchase price of the certificates.

While it is true that the certificates were used in a round-robin fashion to secure the various loans which were made, this was permitted under the terms of the loan to petitioner and I can only conclude that the loans here were real, not mere bookkeeping entries or paper transactions of the Livingstone type, and in no sense shams. The Court's findings make it evident that the transaction was real enough to result in receipts by petitioner of thousands of dollars in gains and interest, yet the majority would have it that petitioner never owned the certificates or never owed Gibraltar on his note, and therefore cannot deduct the interest he paid thereon, even, as I read the opinion, for the 1 month for which the loan was outstanding and in existence.

True, petitioner never personally received the certificates, which merely passed around among the various banks involved. But the banks and Gibraltar were acting on behalf of their respective principals throughout and once the conclusion is reached that there were existing certificates purchased, enforceable loans creating legal liabilities, and an actual transfer of funds, then it seems to me that we cannot label all that occurred "a sham" and we should allow the deduction for "interest" paid during the taxable year.

The facts disclosed by the record in this case distinguish it completely from *Gordon MacRae*, 34 T.C. 20 (1960), affd. 294 F. 2d 56 (C.A. 9, 1961), certiorari denied 368 U.S. 955 (1962), and the line of so-called Livingstone cases on which the majority relies. Also, I cannot silently swallow the majority's casual brushoff of *L. Lee Stanton*, 34 T.C. 1 (1960). The distinction between the facts of *Stanton* and the facts here is not as apparent to me as it appears to be

to my brothers. I also believe that *Knetsch* v. *United States*, 364 U.S. 361 (1960); *W. Stuart Emmons*, 31 T.C. 26, and *Weller* v. *Commissioner*, 270 F. 2d 294 (C.A. 3, 1959), affirming 31 T.C. 33, are factually distinguishable. I would much prefer to see us follow the rationale of *Stanton* in deciding this case on the facts disclosed. As we pointed out there, the disputed payments involved in the *Knetsch*, *Weller*, and *Emmons* cases were made to the life insurance companies which sold the annuities, and the "interest on the bank loans was not in controversy." *L. Lee Stanton*, *supra* at 10. We distinguished those cases by pointing out that the payments in issue were not interest but were in fact the purchase price of a tax deduction. Certainly we can and should continue to be vigilant to strike down sham transactions of this sort or of the Livingstone paper-bag-full-of-hot-air variety and disallow interest deductions claimed as a result thereof. However, in my view this is not such a case.

The payments petitioner seeks to deduct here were of interest, as I see it, paid for the use or forbearance of money. I do not subscribe to the view that to permit an interest deduction there must be a "valid commercial reason for paying interest," *Joseph H. Bridges*, 39 T.C. 1064 (1963), affd. 325 F. 2d 180 (C.A. 4, 1963); nor do I agree with the views of the majority here that such expense, to be deductible, must be incurred in a transaction entered into for profit, or in a transaction destined to produce an economic gain other than a substantial reduction in taxes. I would hold for the petitioner under the facts presented and leave corrective action to protect the revenue, if such is deemed desirable, to Congress. Meanwhile, I think we should permit a cash basis taxpayer to deduct interest paid in a taxable year where he incurs a bona fide enforceable indebtedness, whatever his motive or purpose may have been. Even if a taxpayer is only seeking to save tax dollars by reducing his tax liability, and has no other economic purpose or profit motive in mind, he should be allowed all deductions which the law permits. *Gregory* v. *Helvering*, 293 U.S. 465 (1935); *L. Lee Stanton*, *supra*. See also my brother Fay's dissenting opinion filed herein, quoting from Mr. Justice Harlan's concurring opinion in *Commissioner* v. *Brown*, 380 U.S. 563 (1965).

Fay, *J.*, agrees with this dissent.